**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br> v.<br><br>KEVIN N. SMITH,<br><br>        Defendant. | Case No. 1:20-CR-74<br><br>The Honorable Anthony J. Trenga<br><br>Hearing: Nov. 17, 2021 |

**MR. KEVIN SMITH'S MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 29**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

LEGAL STANDARD........................................................................................................... 2

RELEVANT FACTUAL BACKGROUND ......................................................................... 3

   A.  Background of SDB ............................................................................................. 3

   B.  Michael Myers's Efforts To Deceive Regarding SDB's WOSB Status ............................ 4

   C.  Mr. Smith's Job Interview ................................................................................. 5

   D.  Mr. Smith's Time as General Manager........................................................................ 6

   E.  The May 14, 2014 email .................................................................................. 8

   F.  The May 30, 2014 Business Plan .................................................................. 12

   G.  June 4, 2014 Meeting with Patricia Overway ............................................... 14

   H.  Mr. Smith Visits USA Headquarters and Meets with Anne Robins ............... 16

   I.  SDB's Website Revisions ............................................................................... 17

   J.  The Jacobs Bid and the Sale of Anne Robins' Shares to Mike and Mark Myers............. 17

   K.  Mr. Myers's Continued Deception of Kevin Smith On Anne Robins's Role and the WOSB Issue........................................................................................... 19

ARGUMENT ...................................................................................................................... 20

   A.  The Evidence Failed To Show That Mr. Smith Understood The Two-part WOSB Definition And That His Certifications of SDB as a WOSB Were Knowingly False... 20

   B.  The May 14, 2014 Email And Patricia Simpson's Testimony Do Not Constitute Substantial Evidence Of Mr. Smith's Guilt. .................................................. 22

   C.  The May 14, 2014 Email Is Not Evidence of Mr. Smith's Guilt, As Definitively Established By Mr. Smith's May 30th Business Plan. .................................................. 23

   D.  The Meeting With Ms. Overway. .................................................................. 24

   E.  There Was Conclusive Evidence Of Mr. Smith's Innocence That The Government Could Not—And Did Not Even Attempt To—Explain. ........................................................ 25

   F.  The Testimony Of Mr. Smith Went Essentially Unchallenged By The Government. ....... 27

CONCLUSION.................................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

2 Charles A. Wright, Federal Practice and Procedure § 461 (2d ed. 1982)................................... 5

*Evans-Smith v. Taylor*, 19 F.3d 899 (4th Cir. 1994).................................................................. 5

*United States v. Alerre*, 430 F.3d 681 (4th Cir. 2005) .................................................................. 5

*United States v. Arrington*, 757 F.2d at 1484 (4th Cir. 1985)...................................................... 27

*United States v. Bonner*, 648 F.3d 209 (4th Cir. 2011) ...................................................... 5, 24, 29

*United States v. Burgos*, 94 F.3d 849 (4th Cir. 1996).................................................................... 6

*United States v. Grace*, 367 F.3d 29 (1st Cir. 2004)..................................................................... 5

*United States v. Herberman*, 583 F.2d 222 (5th Cir. 1978).......................................................... 5

*United States v. MacCloskey*, 682 F.2d 468 (4th Cir. 1982) ........................................................ 5

*United States v. Nukida*, 8 F.3d 665 (9th Cir. 1993)..................................................................... 5

*United States v. Wilson*, 484 F.3d 267 (4th Cir. 2007) ................................................................ 24

**Statutes**

18 U.S.C. § 1341............................................................................................................................ 3

18 U.S.C. § 1349............................................................................................................................ 3

**Rules**

FED. R. CRIM P. 29 ....................................................................................................................... 4

Mr. Kevin Smith, by and through counsel, pursuant to Federal Rule of Criminal Procedure 29, respectfully submits this Motion for Judgment of Acquittal.

## **INTRODUCTION**

On August 3, 2021, Kevin Smith was convicted after trial of Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349 (Count 1) and Wire Fraud, in violation of 18 U.S.C. § 1341 (Counts 2 and 4-7).[1] Even when viewed in the light most favorable to the government, the record here demonstrates that Mr. Smith simply did not commit the offenses charged in the counts of conviction, nor was there substantial evidence of such.

The government's case against Mr. Smith was in the nature of *res ipsa loquitor*:  Mr. Smith was presented with emails and certifications stating the two-part definition for WOSBs under the FAR, *so he must have read and understood those things*.  But far from proving that conclusion, the government failed to offer a single email or other document reflecting consciousness of guilt on Mr. Smith's part.  To the contrary, there was a mountain of exculpatory evidence reflecting that Mr. Smith *did not* read—or fully understand—the two-part definition for a Woman Owned Small Business ("WOSB") under the Federal Acquisition Regulations ("FAR").  That evidence included Mr. Smith's own repeated representations to outside third parties that Chief Executive Officer ("CEO") Michael Myers, a man, controlled the company.  Those representations were entirely inconsistent with Mr. Smith's guilt, and yet the government did not begin to account for them at trial.  Relatedly, there was ample evidence supporting the defense's position that the principal reason Mr. Smith did not understand the complete legal

---

[1] Mr. Smith was acquitted of Count 3, an inconsistent verdict that underscores the arbitrary nature of the jury's findings on the remaining counts.

definition of a WSOB and why SDB did not qualify is that his boss, Michael Myers, sought to prevent him from doing so.

When all of the evidence is considered together, and the legal requirement of *mens rea* is properly understood, no reasonable juror would have convicted Mr. Smith. To the contrary, this is a clear-cut case of an innocent person who has been wrongfully convicted. The Court should acquit Mr. Smith under Federal Rule of Criminal Procedure 29.

## LEGAL STANDARD

Rule 29 provides that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." FED. R. CRIM P. 29(c). In deciding such a motion, the Court must consider "whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir. 1982). Substantial evidence, in turn, is defined as "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005) (citation omitted).

"While all inferences must be made in favor of the prosecution, leaps of logic should not be." *Evans-Smith v. Taylor*, 19 F.3d 899, 908 n.22 (4th Cir. 1994). Thus, "a trial judge has the duty to grant the motion for judgment of acquittal when the evidence, viewed in the light most favorable to the government, is so scant that the jury could only speculate as to defendant's guilt." *United States v. Herberman*, 583 F.2d 222, 231 (5th Cir. 1978). For example, a Rule 29 judgment of acquittal was affirmed by the Fourth Circuit where the government's case rested on "missing, flawed, or contradictory facts" that led to the conclusion that no reasonable trier of fact

could hold defendant guilty beyond a reasonable doubt. *United States v. Bonner*, 648 F.3d 209, 213 (4th Cir. 2011).

Rule 29 "is an important safeguard to the defendant," in that "[i]t tests the sufficiency of the evidence against him, and avoids the risk that a jury may capriciously find him guilty though there is no legally sufficient evidence of his guilt." *United States v. Nukida*, 8 F.3d 665, 670 (9th Cir. 1993) (quoting 2 CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 461, at 637–38 (2d ed. 1982)); *see United States v. Grace*, 367 F.3d 29, 34 (1st Cir. 2004) ("Rule 29 protects a defendant against an improper or irrational verdict of the jury") (internal quotation marks omitted). In making that determination, the court must look at "the complete picture that the evidence presents." *United States v. Burgos*, 94 F.3d 849, 863 (4th Cir. 1996).

## RELEVANT FACTUAL BACKGROUND

### A.   Background of SDB

The evidence at trial showed that SDB was founded in 1994 by Larry Myers and Anne Robins for the purpose of obtaining and performing on government contracts, including WOSB set-aside contracts. Under the ownership agreement, Ms. Robins owned 51% of the company and Larry Myers owned 49%. Although Ms. Robins was involved in some aspects of SDB's management prior to her retirement in April 2013, she never ran the day-to-day operations of the company and never controlled its decision-making; Larry Myers did. 7/27AM (Robins) Tr. at 215. SDB was therefore likely never, in fact, a legitimate WOSB under the FAR.

Notwithstanding the above, Ms. Robins believed that SDB was a legitimate WOSB until approximately 2009 or 2010—a period of about 15 years.[2] Throughout the company's existence,

---

[2] At no time did the government explain why it credited Ms. Robins's testimony on her good faith belief that SDB was a legitimate WOSB while rejecting entirely the possibility that Kevin Smith (who worked at SDB while it was a WOSB for just over one year) believed the same.

a long series of SDB employees (John Albert, Sabrina Kidd, others) signed the same WOSB representations and certifications that Mr. Smith would be asked to sign once he got there.

In October 2012, Henry Gifford "Giff" Eldredge interviewed for the Chief Operating Officer ("COO") position at SDB. Either during his job interview or shortly after, Mr. Myers told Mr. Eldredge that SDB could self-certify as a WOSB so long as Ms. Robins still owns 51% of the company. Mr. Eldredge believed him. 7/27PM (Eldredge) Tr. 93-94. That was the case even though Mr. Eldredge had prior experience working with WOSBs. And Mr. Eldredge believed it even though he—unlike Mr. Smith—knew about Anne Robins's retirement at the time it happened, *i.e.*, April 2013. 7/27PM (Eldredge) Tr. 98 ("Q: So you believed this ownership theory, this self-certification theory, even after April of 2013, correct? A: Yes."). No one at SDB conveyed any doubts to Mr. Eldredge regarding SDB's ability to represent itself as a WOSB. *Id.*

## B.   Michael Myers's Efforts To Deceive Regarding SDB's WOSB Status

The evidence demonstrated a sustained effort by CEO Mike Myers to mislead Kevin Smith, among others, about whether SDB was a legitimate WOSB. This is indisputable, and yet the government at no time addressed this evidence or explained how it was possibly consistent with Mr. Smith's guilt of either conspiracy or wire fraud.

Mr. Myers's scheme to deceive others (including his own employees) regarding SDB's WOSB status began well before Mr. Smith began working at the company. As discussed, in 2012, Mr. Myers successfully convinced Mr. Eldredge—a person who, unlike Kevin Smith, had prior experience with WOSBs, 7/27 (Eldredge) Tr. 94—that SDB could legally "self-certify" as a WOSB, so long as Ms. Robins continued to own 51% of the company.

Mr. Myers's scheme to mislead continued in 2013, when he committed bank fraud to renew a $350,000 line of credit from SDB's lender, National Penn Bank. DX 35. When SDB's

banker, Ed Kittrell, raised questions regarding how Ms. Robins's April 2013 retirement would affect SDB's WOSB contracts, Mr. Myers responded in a manner that presaged his deceptive May 14, 2014email to Mr. Eldredge and Mr. Smith. Mr. Myers's email stated:

> Hi Ed,
>
> At the moment our contract with Qinetiq is small business only and NASA does not specifically award contracts to woman owned companies. This said if we want to pursue other government contracts off the cape it may be of more importance. I'm looking into this issue now, however Anne will remain 51 percent share holder until I have paid for her shares. This will not happen until sometime in 2014 probably around the same time as our the [sic] next line renewal giving us the chance to fully understand the impact of this change in status on our business.
>
> If necessary my wife will become the 51 percent share holder although this is not my preference and doing so may not help our cause. The trend is for certification of minority status and just having a woman as a 51% share holder does not meet this requirement. In other word, I would need to sell the business to a woman manager that worked for SDB 100% of the time in order to meet the emerging guideline.

DX 37. Several days later, based on Mr. Myers's false representations, the bank granted Mr. Myers's request to renew the line of credit. DX 38.

## C.    Mr. Smith's Job Interview

In December 2014, Mr. Smith interviewed to work at SDB. In preparation for the interview, Mr. Smith reviewed SDB's website, which noted that SDB was a WOSB. 8/2 (Smith) Tr. 43. As a result of that research, Mr. Smith specifically asked Mr. Myers and Mr. Eldredge "whether SDB is still a WBE." GX 9; 8/2 (Smith) Tr. 47 (Mr. Smith testifying, "[i]t was a question I asked because their website looked so outdated. I didn't know if it was still applicable, so I asked the question."). Mr. Myers responded, "yes, SDB is still a WBE until ownership transition to Mike/Mark Myers is completed." GX 9. This told Mr. Smith both that a woman (Anne Robins) continued to own the company and that they were a WOSB because of her ownership interest. 8/2 (Smith) Tr. 48. It also told him that when Ms. Robins sold her

interest, SDB would no longer represent itself as a WOSB, as it would no longer qualify under the applicable rules. *Id.*; *see also* GX 9.

Mr. Myers and Mr. Eldredge decided to hire Mr. Smith, at a set salary of $100,000, with no bonus. GX 17 (offer letter).

### D.     Mr. Smith's Time as General Manager

On Mr. Smith's first day at SDB, March 3, 2014, Mr. Eldredge sent him an organizational chart reflecting Anne Robins as President of SDB. DX 95. Mr. Smith viewed the org chart as consistent with what he had been told during his job interview about Ms. Robins owning 51% of the company. 8/2 (Smith) Tr. 54. On March 25, 2014, Mr. Smith revised the org chart to add his own name as General Manager, but left Ms. Robins as President, as no one had told him that she was retired or no longer in that position. DX 119; 8/2 (Smith) Tr. 60).

During his first few months on the job, Mr. Smith was consistently encouraged to take advantage of SDB's WOSB status, the legitimacy of which was never in question. John Albert, an employee of SDB since 1994 and the person whose duties Mr. Smith was assuming, sent Mr. Smith multiple emails in March and April 2014 encouraging Mr. Smith to attend industry-day events for WOSBs. *See* DX 42 (3/18/14 John Albert email to Kevin Smith regarding WOSB industry day); DX 45 (4/8/14 John Albert email to Kevin Smith regarding WOSB industry day).

When Mr. Smith asked Mr. Albert for background on the company, Mr. Albert supplied Mr. Smith with the narrative that he both believed and utilized for the duration of his tenure at SDB. On April 9, 2014, Mr. Albert explained to Mr. Smith SDB's background and history. His email stated in part, "Larry Myers came down to look us over and invested in our company. We became SDB, *a self certified Woman owned company* and continued to work at [Kennedy Space Center at Cape Canaveral Air Force Station]. . . Anne has owned 51% of the company from the beginning and Larry had 49%." DX 116 (emphasis added). This was one of several times that

Mr. Smith, during his first several months at SDB, heard the company described as a "self-certified" WOSB, which, as explained to Mr. Smith by Mike Myers, John Albert, and others, "was based on ownership and that 51 percent or more had to be owned." 8/2 (Smith) Tr. at 73, 91.

Mr. Smith put together numerous business and marketing documents during his time at SDB. *See, e.g.*, Capabilities Brochure (GX 23), Draft Business plan (GX 26). In its trial presentation, the government juxtaposed the WOSB representations in those documents against the many ways that Mr. Smith would not have seen Anne Robins's guiding hand on SDB during this time period. It was unclear, however, why the government thought this mattered if Mr. Smith did not understand the second part of the two-part definition until after May 2014.[3] The WOSB representations in these documents were not probative given that Mr. Smith's defense was that he did not understand the two-part definition and thought SDB did qualify as a WOSB, regardless of Anne Robins's day-to-day involvement.

In addition, most, if not all, of the WSOB representations the government identified as originating with Mr. Smith were in fact retreads from materials sent to Mr. Smith by Mike Myers or others, such as long time SDB employee John Albert. *See, e.g.,* 8/2 (Smith) Tr. 78-79 (discussing updating of Capabilities Brochure, "I just used what they had and improved it"). The evidence showed that the WOSB representations from Mr. Smith's business plan, including in the "SWOT Analysis" section, were borrowed from a "SDB Positioning" document Mr. Myers had forwarded to Mr. Smith on March 27, 2014. DX 43; 8/2 (Smith) Tr. 85. That document had been prepared in January 2010 by a consulting firm SDB had hired during that time. *Id.* No one

---

[3] Notably, the government's chief witness, Giff Eldredge, the COO of SDB and an executive since 2012, testified that he only understood the issues with SDB's WOSB status *after* reviewing the ABA article that Mike Myers sent with May 2014 email. As with Anne Robin's, the government never explained why it credited Mr. Eldredge's testimony on this issue but not Mr. Smith's, who was at SDB for a significantly shorter period of time.

at SDB raised any issues whatsoever regarding the WOSB representations contained in these materials.

**E.    The May 14, 2014 email**

The government's case focused heavily on a single email chain from the morning of May 14, 2014. The discussion reflected in the May 14th email began during SDB's weekly conference call on May 13, 2014. 8/2 (Smith) Tr. 94-95; 7/27 (Eldredge) Tr. 129. One of the subjects covered at that meeting was Mr. Smith's ongoing assignment of reviewing the options for other set-asides SDB could apply for once Anne Robins sold her ownership interested in SDB to Mr. Myers, and SDB was no longer "woman owned." *Id.*

The May 14th email picked up on the weekly conference call between Mr. Myers, Mr. Eldredge, and Mr. Smith from the day before. 7/27 (Eldredge) Tr. 129. Mr. Myers sent the email at 7:21 am on May 14th. Mr. Myers stated that he had been "researching the WOSB certification process" and that SDB "can remain self-certified if" Mr. Myers's spouse were "made 51 percent shareholder." GX 39. Mr. Eldredge agreed that Mr. Myers's email conveyed the proposition that SDB could still *legitimately* claim WOSB status for another three years based on self-certification. 7/27PM (Eldredge) Tr. 133 ("Q: So [Mr. Myers is stating that] we've got three years. We can still legitimately claim we are a woman-owned small business for three years based on self-certification, correct? A: Yes."). Mr. Myers continued in the email, "[a]s this is not an option, I will need to discuss plans to transition Anne Robins from president of SDB over the duration of the ownership transfer, which will take another three years." *Id.* At the bottom of his email, Mr. Myers attached a link to an ABA article that represented the results of his purported "research." *Id.*

A comparison of Mr. Myers's initial May 14, 2014 (GX 35) email to his successful effort to defraud National Penn Bank in November 2013 (DX 37) is illuminating. The emails share

numerous cogent similarities, presumably because, in each case, Mr. Myers was attempting to provide the reader(s) with false comfort regarding SDB's WOSB status. In both emails, Mr. Myers:

- sought to buy time by conveying that SDB could legally remain a WOSB so long as Anne Robins continued with the company, which he would ensure; *compare* DX 37 ("I'm looking into this issue now, however, Anne will remain 51 percent owner until I have paid for her shares") with GX 39 ("I will need to discuss plans to transfer Anne Robins from president of sdb over the ownership transfer");

- proposed (but then himself shot down) the prospect of his wife taking Anne Robins's place;

- referred to "research" he had performed on the "trend" or "emerging guideline" for WOSBs to bolster the credibility of his opinion.

GX 35; DX 37. Both email exchanges also reflect Mr. Myers's fraudulent representation that SDB's Qinetiq (Vencore) contract was not a WOSB contract at all, a representation that Mr. Myers made in each case in order to decrease scrutiny of this issue.[4]

Indeed, the only notable difference between the two emails is whether Mr. Myers expressed any doubt as to whether keeping Anne Robins on at SDB would allow the company to continue representing itself as a WOSB. In Mr. Myers's email to Mr. Kittrell, he expressed some doubt based on the so-called "trend" and "emerging guideline;" in his email to Mr. Smith, however, he expressed no such doubt. *See infra.* To the contrary, his clear message to Mr. Smith was that keeping Ms. Robins on "*as president*" of SDB for three more years was sufficient for SDB to continue to represent itself as a WOSB during that period. *Id.* (emphasis added).

The evidence showed that Mr. Smith opened the ABA article link 17 minutes before responding to Mr. Myers's email, and began typing his response to the email six minutes prior to

---

[4] In the May 14, 2014 email exchange, the observation that the Qinetiq (Vencore) contract was small business only was in fact made by Mr. Eldredge, but only because Mr. Myers had misled Mr. Eldredge by showing him a version of the QNA contract that did not have the "WOSB" box checked. *See* 7/28 (Eldredge) Tr. 32.

sending it. Stipulation 21 (ECF No. 144). Mr. Smith responded to Mr. Myers at 8:15 a.m. He

stated, "Agreed. The self-certification is our best option at this point." GX 39. The mention of

"self-certification" referred to the idea that Mr. Myers had been discussing with Mr. Eldredge

since Mr. Eldredge's first day working at SDB back in 2012. 7/27PM (Eldredge) Tr. 135. Mr.

Smith also discussed other set aside categories, including with respect to a company, Osprey,

mentioned in the first few pages of the ABA article. GX 39.

Mr. Smith's comments in his email were in accordance with what Mr. Myers had told

both Mr. Eldredge and Mr. Smith from the time they began work at SDB, including at Mr.

Smith's interview for the General Manager position in December 2013: that SDB "can remain

self-certified so long as [Anne Robins] is the owner." 7/27PM (Eldredge) Tr. 137. Mr. Smith

also discussed the options for "formal" certification—which he described as a more onerous

classification—and that one issue would be how someone up in Pennsylvania could qualify. Mr.

Smith also brought up the issue of other potential set-asides, an area he had been assigned to

research at the beginning of his employment at SDB. *See, e.g.*, 8/2 (Smith) Tr. 106-08, 112.

At 9:47 am—two hours and 27 minutes after Mr. Myers sent his initial email, and after

reading the ABA article Mr. Myers had provided a link to—Mr. Eldredge responded to Mr.

Myers's email. Mr. Eldredge observed in his email that it was the first time he had seen the

concept of self-certification explained in this way. GX 38. After reviewing the article in full,

Mr. Eldredge stated that if what is stated in the article is correct, SDB was on "very thin ice" in

representing itself as a WOSB. *Id.* His email also downplayed the significance of this issue for

SDB, based on his misperception—a misperception induced by Mr. Myers—that SDB's contract

with Qinetiq (Vencore) was small business only. Mr. Eldredge testified that it was only after

reading the May 14th email and the attached ABA article that he realized for the first time that

Ms. Robins's 51% ownership interest in SDB was not enough for SDB to represent itself legally as a WOSB. 7/27 (Eldredge) Tr. 46 (Mr. Eldredge "realized for the first time that ownership might not be enough").

Mr. Eldredge's email mentioned an interested party challenging SDB's bids, but nothing in his email suggested that SDB was doing anything illegal in continuing to represent itself as a WOSB. 7/27 (Eldredge) Tr. 143. In fact, Mr. Eldredge testified that he did not think SDB was committing a crime, either before the May 14th email or as the company went forward representing itself as a WOSB. As Mr. Eldredge testified:

Q: Did you think you were committing a crime from here on out?

A: No.

Q: You didn't think so?

A: I didn't think so, no.

*Id.* at 144.

Mr. Eldredge further testified as to the importance—or, more accurately, lack of importance—the May 14th email assumed in his mind and in his interactions with Mr. Myers and Mr. Smith. Mr. Eldredge did not regard this issue as urgent and did not see the need for follow up. 7/27 (Eldredge) Tr. 148-49. Mr. Eldredge sent an additional email four days later, on a Sunday, to address an entirely different aspect of the email, which did not even mention the issues with SDB's WOSB status. GX 43; *see also* 8/2 (Smith) Tr. 115 ("Q: And did his response have anything to do with the woman-owned business status of SDB? A: No, it was in reference to the document [on other set-asides] I sent to him.").[5] When search warrants were

---

[5] The government suggested to the jury that the discussion of SDB's WOSB status lasted from May 14 until May 18th, 7/27 (Eldredge) Tr. 30, when in fact Mr. Eldredge's final email on the 18th did not address whether SDB could represent itself as a WOSB. The discussions on that subject were confined to several emails on a single morning.

executed at SDB in July 2016, Mr. Eldredge had to go back and search his email for any relevant discussion of this issue; the only communication he found was the May 14, 2014 email, which he had forgotten all about.  Tr. 84 ("Q:  You had forgotten all about [the May 14, 2014] email, hadn't you?  A:  Yes.").

In opening statement, the government told the jury that, following the May 14, 2014 email, Mr. Myers "directed them to keep going, to try to win business, to proceed as usual." 7/26 (Opening) Tr. 52.  Indeed, the government repeatedly (and misleadingly) conveyed to the jury that there was express direction to continue *notwithstanding the realization that SDB did not qualify as an SDB*.  In fact, however, the evidence showed there was no such direction; there was no discussion of the issue at all.  Instead, the evidence showed nothing more than that SDB continued to perform on its WOSB contracts and continued to seek work as a WOSB—not that the issue raised by Mr. Eldredge in the May 14, 2014 email was ever again discussed.

## F.     The May 30, 2014 Business Plan

Whether Mr. Smith, in the wake of the May 14, 2014 email, now understood the two-part WOSB definition, as Giff Eldredge claimed to have done, was definitively answered two weeks later, on May 30, 2014.  On that day, Mr. Smith circulated a revised draft of his Business Plan. GX 45.  In a new addition from the version circulated on April 15, 2014 (GX 26), this version stated that "[s]ince the passing of our business founder, *Mike Myers has taken control of USA and SDB and has become more directly involved in SDB business operations*."  GX 45 (emphasis added).  The defense argued throughout trial that Mr. Smith (or anyone knowingly engaged in a WOSB fraud) would not have made this statement had he understood that it was fatal to SDB's ability to represent itself as a WOSB.  The government at no time even attempted to explain how this statement as to who "control[led]" SDB was consistent with its theory that Mr. Smith was a knowing participant in a scheme to defraud.  The government's chief cooperator, Mr. Eldredge,

acknowledged that one who understood the two-part WOSB definition and his comments in the

May 14, 2014 email would not also write in a business plan that Mr. Myers was "in control" of

SDB.  7/27 (Eldredge) Tr. 47.

> Q:  [Y]ou read the ABA article.  Right?

> A:  Correct.

> Q:  A woman ha[s] to control.  Right?

> A:  Yes.

> Q:  And this [business plan] says right here that Mike Myers has taken control of USA and SDB.  Right?

> A:  Yes.

> Q:  Okay.  And if that was true, and you understand that, then . . . you can't say you're a woman owned small business if that's true.  Right?

> A:  Because you're saying Mike Myers has taken control of SDB and therefore they're not a woman owned small business?

> Q:  Right.

> A:  Yes.

> Q:  So you wouldn't write this and also say you're a women-owned small business based on the 51 percent share ownership in the same document, in the same paragraph if you understand that those are completely inconsistent with each other.  Right?

> A:  I wouldn't, no.

Tr. 46-47.

Other statements from the May 30, 2014  business plan similarly undermined the

government's position that Mr. Smith was knowingly engaged in wire fraud.  In that document,

Mr. Smith laid out the "ownership-only" theory of (self-certified) WOSBs, noting that "[a]

parallel activity is to acquire the 51% share from Anne Robbins essentially making SDB a Small

Business versus a Small Woman-Owned Business…SDB will face additional challenges for Government work as Small Business versus a Woman-Owned Small Business when that transition is completed." GX 45. It would make no sense for Mr. Smith to have explicitly set forth this theory had he understood that it reflected a fraud.

The government never provided an explanation for why, if Mr. Smith understood the two-part definition of WOSB under the FAR, he would repeatedly commit the fact that Mr. Myers controlled SDB to writing in various places, including in the Business Plan. Nor did it explain why Mr. Smith would openly convey that fact to third parties (such as, according to her testimony, he did to Patricia Overway (*see infra*)). Whatever the government's (undisclosed) theory is—to the extent it even has one—it is necessarily inconsistent with the fact that Mr. Smith provided the May 30, 2014 business plan not just to Mr. Myers and Mr. Eldredge, but also to outside third parties such as Patricia Overway. There is no reasonable explanation for why Mr. Smith would have done that while having an accurate understanding of the two-part WOSB definition.

Mr. Smith's statements in the Business Plan spelling out that Mike Myers is "in control" of SDB cast significant doubt (far more than just a "reasonable" doubt) as to Mr. Smith's guilt of both the conspiracy and substantive wire fraud charges he was convicted of. There is no explanation for Mr. Smith's actions that is consistent with his guilt of these offenses. No one who understood the two-part definition would also write these things in documents anywhere, but especially not in documents that he would subsequently provide to third parties such as Patricia Overway.

## G.    June 4, 2014 Meeting with Patricia Overway

Other than the May 14, 2014 email, the government's only other substantive evidence directed at Mr. Smith's state of mind was the testimony of Patricia Overway, who testified

regarding a single meeting that occurred on June 4, 2014. Ms. Overway's testimony was that Mr. Smith brought a copy of his May 30, 2014 business plan for her, which, again, highlights SDB's control *by a man*. GX 45.[6]

In the days following their meeting, Ms. Overway and Mr. Smith exchanged several emails. The same day as the meeting, Ms. Overway sent Mr. Smith an email summarizing their conversation. DX 102. While the emails included one attachment (of many) that highlighted the WOSB rules,[7] that email itself did not mention any issue with respect to SDB's WOSB status and did not indicate that SDB needs to stop representing itself as a WOSB. Ms. Simpson emailed Mr. Smith again several days later, and again did not mention anything about SDB's WOSB status.

A subject mentioned both in Ms. Overway's emails and that Mr. Smith recalled from their meeting was the need for SDB to have a Capabilities Statement. Mr. Smith accordingly immediately began preparing one following the meeting, using a template Ms. Overway had provided. 8/2 (Smith) Tr. 125; DX 102 (template). Once finalized on June 9, 2014, five days after their June 4, 2014 meeting, Mr. Smith sent the draft Capabilities Statement to Ms. Overway. GX 53. At the very top of the document, it stated, "[f]ounded in 1994, SDB Engineers & Constructors, *a small woman-owned business* located in Titusville, Florida." *Id.*

---

[6] Government Counsel mischaracterized Mr. Smith's conversation with Ms. Overway in closing argument, telling the jury that Mr. Smith confessed that SDB "did not qualify" as a WOSB instead of what Ms. Overway testified to, which was simply that he told Ms. Overway that Anne Robins had become less engaged over time—something that a person engaged in a WOSB conspiracy would never have said to an outside third party.

[7] The government incorrectly told the jury during closing argument that Ms. Overway had highlighted the WSOB rules specifically for Mr. Smith. Tr. 109 (telling jury that Ms. Overway "had highlighted for him the very definition that make it clear that SDB was a scam.") That Ms. Overway had highlighted the rules "for" Mr. Smith was false. *See* 7/28 (Overway) Tr. 228 (Ms. Overway testifying that attachment was highlight before and not specifically for Mr. Smith); 247 (same). This was a significant misrepresentation, as it was the only support for Ms. Overway's testimony that SDB's WOSB status was discussed. Indeed, Ms. Overway had not recalled any such discussion when first approached by the government. And because this mischaracterization of the evidence was made in rebuttal, defense counsel had no opportunity to correct it.

(emphasis added).  The subject of Mr. Smith's email attaching the statement is "SDB capabilities document *for your review and input*."  GX 53 (emphasis added).  Mr. Smith's email to Ms. Overway sending the statement further stated, "This is my first draft.  *Your input would be appreciated."  Id.* (emphasis added).  Notwithstanding Mr. Smith's request, Ms. Overway never responded with any concerns regarding the Capabilities Statement in general or the WOSB representation in particular.

On June 10, 2014, Mr. Smith emailed the same version of the Capabilities Statement he sent to Ms. Overway to Mr. Myers and Mr. Eldredge and an SDB consultant named Dik Getz.  GX 57.  Notwithstanding the alleged significance of the May 14, 2014 email exchange, *Mr. Eldredge paid no attention to the "Woman Owned Small Business" statements contained in the Capabilities Statement.*  7/27 (Eldredge) Tr. 239.  He instead focused on the "competencies" section and whether it adequately marketed SDB's services.  *Id.*  Mr. Eldredge's testimony on the Capabilities Statement underscored how insignificant the discussion in the May 14, 2014 email had been for him.  *Id.* ("Q:  So let me get this straight.  You have this discussion back in the May 14, 2014, email and then you're seeing these things that say women-owned small business, but you're just not focused on them.  Is that fair?  A:  That's fair, sure.").

## H.      Mr. Smith Visits USA Headquarters and Meets with Anne Robins

On July 8, 2014, Mr. Smith visited USA's headquarters in Colwyn, Pennsylvania.  The evidence demonstrated that Mr. Myers had specifically emailed Ms. Robins—who had retired in April 2013—about being present in the office that day, without copying Mr. Smith.  DX 61.  The conversation between Mr. Smith and Ms. Robins was brief, unremarkable, and not probative of any issue in the case except for what, based on both Ms. Robins' and Mr. Smith's testimony, it did *not* include—Anne Robins telling Mr. Smith that she had retired.

The next day, July 9, 2014, Mr. Smith certified SDB's WOSB status in the System for Award Management ("SAM"). GX 65. That certification was consistent with what Mike Myers, John Albert, and others had told Mr. Smith about SDB's WOSB status, and it was consistent with the materials representing SDB as a WOSB that he had sent to Giff Eldredge, Patricia Overway, and others.

## I.       SDB's Website Revisions

On July 25, 2014, Mr. Smith sent Mr. Myers and SDB's web designer an email with draft copy for the revised SDB website for Mr. Myers "review and input before forwarding to [SDB's] web developers." GX 72. In Mr. Smith's email, Mr. Smith proposed a history of SDB *for its public website* that stated, "Following the passing of our beloved business founder, *Mike Myers has taken control of USA Inc. and SDB Inc*." *Id.* (emphasis added). Once again, the government offered no explanation for why Mr. Smith would propose a public statement that Mike Myers controlled SDB if he understood that a woman must control the company for SDB to legally certify itself as a WOSB.

In response, Mr. Myers offered several modifications to Mr. Smith's proposed copy, noting, "I'm not sure how to word Anne's retirement. Any thoughts as she *will remain* a stake holder and most likely continue to sit on the board?" *Id.* (emphasis added). In fact, Anne Robins had retired in April 2013, and—under the sale package Mr. Myers was less than three weeks from consummating with Ms. Robins—would neither remain on SDB's board nor be a "stake holder." On this email again, the government has never accounted for why Mr. Myers would mislead Mr. Smith regarding these issues for any reason other than to deceive him regarding whether SDB was a legitimate WOSB.

## J.       The Jacobs Bid and the Sale of Anne Robins' Shares to Mike and Mark Myers

The evidence showed that this bid was prepared in the same way all of SDB's other bids always had been, including with the representation that the company was a Woman Owned Small Business. Indeed, just a year earlier in September 2013, John Albert had made the exact same certification to Jacobs that Mr. Smith made.

The evidence showed that the Jacobs bid paperwork was a team effort that included many others at SDB, including employees such as Sabrina Kidd and John Albert, whose tenures at SDB long exceeded Mr. Smith's. Mr. Smith's signatures (which were a combination of electronic and wet signatures) appearv23 times in the paperwork, including on the two pages containing WOSB representations, the Vendor Size Status Certification document and Representations and Certifications. Tr. 67. A task list for the contract stated that Sabrina Kidd was, in fact, the employee responsible for the preparation of both of those documents—not Mr. Smith. 8/2 (Smith) Tr. 67-68. DX 69 (Midway Corrosion Task Checklist).

The Jacobs bid was finalized on August 14, 2014 and SDB found out on August 15, 2014 that it would likely win the bid. 8/2 (Smith) Tr. 159. Mr. Smith sent Mr. Myers an email telling him that SDB had won the bid the same day. DX 122.. At the same time that Mr. Smith and others at SDB were working to secure the Jacobs bid, Mr. Myers was in the process of completing his purchase of Anne Robins's ownership stake in SDB. There is no evidence that Mr. Myers or anyone else told Mr. Smith that Mr. Myers's deal to purchase the shares was imminent. Mr. Eldredge testified that he had questions about why the deal was taking so long. Tr. 70.

Mr. Myers purchased Anne Robins's 51% ownership interest on August 19, 2014. DX 68 (Stock Purchase Agreement). The same day, Ms. Robins signed a letter resigning from SDB's Board of Directors. GX 88. Mr. Eldredge initially testified that he did not learn of the

sale date until his interview sessions with the government. As with Mr. Smith, Mr. Myers had never shown Mr. Eldredge the sale agreement or Ms. Robins's letter resigning from SDB's Board of Directors. The defense then introduced DX 67, however, which begins with an email written by Mr. Smith on August 19, 2014, to Mr. Myers, Mr. Eldredge, and John Albert regarding equipment that SDB would need to perform on the Jacobs contract. DX 67. Instead of responding to Mr. Smith, however, Mr. Myers forwarded the email to Mr. Eldredge, removing Mr. Smith and Mr. Albert from the email chain. Mr. Myers email to Mr. Eldredge informed him that the sale of Ms. Robins's shares had been consummated with a payment to her of $115,000. GX 89 (check to Anne Robins). Mr. Myers wrote:

> Please work this out with Kevin and spread costs out over three years if possible.
> If not possible what will be the total outlay of cash and its impact on our bank
> account. *SDB was drained of 115,000 today for biz transfer. Deal is done.*

DX 67 (emphasis added).

Unlike with Mr. Eldredge, there is no evidence that Mr. Myers, anytime in 2014, told Mr. Smith about the ownership transfer. Mr. Smith did not see any of the documents associated with the purchase until preparing for trial. 8/2 (Smith) Tr. 162. Indeed, as set forth *infra*, the evidence is clear that Mr. Myers continued to deceive Mr. Smith regarding whether Ms. Robins still held her ownership interest in SDB.

**K.     Mr. Myers's Continued Deception of Kevin Smith On Anne Robins's Role and the WOSB Issue.**

There is no evidence that Mr. Smith was ever told about Mr. Myers's purchase of Anne Robins's shares in all of 2014. To the contrary, the evidence showed that Mr. Myers continued to deceive Mr. Smith regarding Anne Robins's role at the company and SDB's WOSB status— an effort by Mr. Myers that the government never even attempted to explain. In January 2014, five months after Mr. Myers purchased Anne Robins's ownership interest in SDB and Ms.

Robins resigned from SDB's Board—but before there is any evidence of Mr. Smith being told about it—there is a further exchange regarding SDB's website that definitively establishes Mr. Myers's dishonesty with Mr. Smith (and others) on the issue of Anne Robins's role. In discussing how to characterize Anne Robins's role on SDB's website, Mr. Myers instructs Mr. Smith and Sabrina Kidd, "[w]e should have Bio's [on SDB's website] for myself, Mark, Giff and Anne. *Anne should be presented as a Board member with a financial stake in the companies success*." DX 70 (emphasis added). Of course, unbeknownst to Mr. Smith, but well understood by Mr. Myers, Anne Robins *had resigned* from the Board as part of the sale of her 51% ownership interest to him back in August 2014 and no longer had "a financial stake in" SDB's success.

The evidence showed that, upon learning of the ownership transfer in 2015, Mr. Smith ceased to represent SDB as a WOSB and modified SDB's WOSB representations in every place that they appeared, including in SAM. 8/2 (Smith) Tr. 174; *see, e.g.*, DX 174; GX 139; GX 144.

Finally, upon being interviewed by law enforcement in July and November, 2016, after he had left SDB, Mr. Smith told the agents the same thing he told the jury: that he had believed in good faith that SDB could self-certify itself as a WOSB based on Ms. Robins's 51% ownership. 8/2 (Smith) Tr. 197-201.

## **ARGUMENT**

**A.     The Evidence Failed To Show That Mr. Smith Understood The Two-part WOSB Definition And That His Certifications of SDB as a WOSB Were Knowingly False.**

In order to convict Mr. Smith of conspiracy to commit wire fraud (Count 1), the government had to prove that (1) a conspiracy to commit wire fraud was formed, reached or entered into by two or more persons; (2) at some point during the life or existence of the conspiracy, the defendant knew the purpose of the agreement; and (3) with knowledge of the

purposes of the conspiracy, the defendant then deliberately joined the conspiracy, agreement or understanding. *See* Jury Instructions, ECF No, 145-6. Importantly, association with someone involved in the conspiracy or even knowledge or approval of the conspiracy, without knowing participation, is insufficient to support a conviction. *See, e.g., United States v. Wilson*, 484 F.3d 267, 280 (4th Cir. 2007) ("mere presence or association was insufficient to prove knowing participation in a conspiracy").

In order to convict Mr. Smith of wire fraud (Counts 2-7), the government had to prove beyond a reasonable doubt that Mr. Smith: (1) knowingly devised or participated in a scheme or artifice to defraud and to obtain money or property by means of material false or fraudulent pretenses, representations, or promises; (2) the scheme or artifice to defraud, and pretenses, representations or promises were material, that is, they would reasonable influence a person to part with money or property; (3) he did so with the intent to defraud; and (4) in advancing, or furthering, or carrying out this scheme to defraud, he transmitted any writing, signal or sound by means of a wire, radio, or television communication in interstate commerce. JURY INSTRUCTIONS, ECF No, 145-6, p. 55.

The trial reflected a near-total failure by the government to present evidence demonstrating that Mr. Smith *knowingly* misrepresented SDB as a WOSB, or knowingly participated in a conspiracy to do the same; it therefore failed with respect to both Count 1 (conspiracy) and Counts 2-7 (wire fraud). In fact, there was substantial evidence demonstrating precisely the opposite: that Mr. Smith did not understand that a woman must not only own, but also must control, the company. This evidence reflects precisely the kind of "contradictory facts" that require a judgment of acquittal. *Bonner*, 648 F.3d at 213 (judgment of acquittal

appropriate where the government's case rested on "missing, flawed, or contradictory facts").
The Court should accordingly grant Mr. Smith's motion under Rule 29.

**B.    The May 14, 2014 Email And Patricia Simpson's Testimony Do Not Constitute Substantial Evidence Of Mr. Smith's Guilt.**

On the critical issue of whether Mr. Smith in fact understood the two-part definition of a WOSB, there was scant evidence beyond the language of the certifications themselves, and no evidence that Mr. Smith had accurately understood those certifications.  The government presented only two witnesses on the pivotal issue of Mr. Smith's state of mind,:  (1) Giff Eldredge, whose testimony centered around a single email from May 15, 2014; and (2) Patricia Overway, whose testimony concerned a single meeting that occurred over seven years ago, on June 4, 2014.

Even when this evidence is taken together and viewed in the light most favorable to the government, it does not constitute "substantial evidence" of Mr. Smith's guilt.  While it would be insufficient standing alone to meet the government's burden, even when viewed in a light most favorable to it, the definitive proof of Mr. Smith's innocence lies in subsequent events—in the days or weeks after—that demonstrated beyond question that Mr. Smith still did not understand the requirement that a woman must "control" SDB in order for the company to constitute a legitimate WOSB.

These subsequent events—which most notably include the May 30th Business Plan and the June Capabilities Statement—definitively disproved the government's theory that Mr. Smith understood that SDB was not in fact a legitimate WOSB.  And, most tellingly, the government has never begun to explain how these events could possibly be consistent with its theory of Mr. Smith's guilt, as they obviously are not.

**C.    The May 14, 2014 Email Is Not Evidence of Mr. Smith's Guilt, As Definitively Established By Mr. Smith's May 30th Business Plan.**

With respect to the May 14, 2014 email, the email itself does not represent significant evidence of Mr. Smith's guilt.  Mr. Myers, the CEO and Mr. Smith's direct report at the company, told Mr. Smith that "transition[ing] Anne Robins from president of SDB over the duration of the ownership transfer" will, based on his "[r]esearch," "buy us time" to consider "options."  GX 35.  Based on that representation from Mr. Myers, as well as the self-certification process Mr. Smith has been led to believe in since he began work at SDB, Mr. Smith believed his boss.

Mr. Smith's Business Plan—sent just two weeks later, and advertising SDB's control by a man—confirms his good faith.  Rather than confronting the obvious issue the Business Plan presented for the government regarding Mr. Smith's state of mind, the government nonsensically argued that the "business plan" somehow reflected an agreement to continue to represent SDB as a Woman Owned Small Business.  Tr. 53.  Given that the business plan specifically stated that Mike Myers, a man, is in control of SDB, the argument that the business plan represented a means of executing the wire fraud scheme is baffling, and yet this was necessarily the kind of illogical reasoning the jury must have accepted—to the extent it understood the requirement of *mens rea* at all—in order to convict Mr. Smith of conspiracy and wire fraud.

Indeed, the government appears to have prevailed with the jury on the perverse argument that Mr. Smith *telling the truth* about Mike Myers being in control of SDB—even to third parties, including Patricia Overway or, as Mr. Smith proposed to do, *on SDB's website*— somehow amounted to evidence *of his guilt*.  The following passage from the government's direct examination of Mr. Eldredge regarding the Business Plan underscore the fatal flaws in the government's case:

Q:  Could you read the . . . enlarged portion [of GX 45, the May 30th Business Plan] we are looking at here?

A:  "Since the passing of our business founder, Mike Myers has taken control of USA and SDB and has become more directly involved in SDB business operations."

Q:  Sir, based on your interactions, with Mr. Myers and Mr. Smith and everyone else at SDB, was that true that Mr. Myers had taken control of SDB?

A:  Yes.

Q:  In this sentence where Mr. Smith used the word "control," does he reference Anne Robins's name anywhere?

A:  No.

7/27 (Eldredge) Tr. 37.  The above passage—which was far from unique to the government's case—amounts to nothing more than a Jedi-mind trick that evidence of Mr. Smith's innocence somehow represents precisely the opposite.[8]  Mr. Smith's repeated representations that Michael Myers controlled SDB were not consistent with an accurate understanding of the WSOB rules, they were inconsistent with it.  Indeed, they represent state-of-mind evidence  "weigh[ing] so heavily against the verdict that it would be unjust to enter judgment."  *United States v. Arrington*, 757 F.2d at 1484, 1485 (4th Cir. 1985).

D.      **The Meeting With Ms. Overway.**

Similar to the May 14th email, Ms. Overway's testimony about her brief meeting with Mr. Smith would not be strong evidence of Mr. Smith's guilt, even standing alone.  The fact that Mr. Smith brought her his business plan, highlighting control of SDB by a man, and the fact that he openly told her that Ms. Robins was not engaged at SDB, according to Ms. Overway, both supported Mr. Smith's defense by underscoring Mr. Smith's lack of understanding of the control requirement—even after the May 14th email.  Moreover, the emails Ms. Overway subsequently

---

[8] https://www.youtube.com/watch?v=bJiqrVWLfdw

sent to Mr. Smith did not reflect any concern for (or discussion of) the WOSB issue.  DX 102-04.  And although one of the many attachments Ms. Overway sent to Mr. Smith highlighted the requirements for WSOBs, that document was—directly contrary to what the prosecutor told the jury in rebuttal on a critical issue[9]—pre-highlighted, and was not the result of any special effort to by Ms. Overway to emphasize the issue to Mr. Smith.

To the extent there was any question about Mr. Smith's state of mind in the wake of his meeting with Ms. Overway, however, the Capabilities Statement Mr. Smith sent her just five days later provided a definitive answer.  GX 53.  That document represents, up front and center, that SDB is a woman owned small business.  Neither Kevin Smith, nor any other rational person, would have sent Ms. Overway this document had they understood Ms. Overway to be saying that SDB could no longer represent itself as a WOSB.

Just as with the May 30th business plan, the government at no time even attempted to explain how the Capabilities Statement, with its continued representation of SDB as a WOSB, could possibly be consistent with Mr. Smith's guilt.  The reason is that there is no such explanation; Mr. Smith continued representing SDB as a WOSB in the Capabilities Statement because he honestly believed—even after the May 14th email and after his meeting with Ms. Overway—that SDB could legitimately do so, as he did not interpret Ms. Overway to have told him otherwise.  There is no other explanation for Mr. Smith's actions consistent with the evidence.

**E.      There Was Conclusive Evidence Of Mr. Smith's Innocence That The Government Could Not—And Did Not Even Attempt To—Explain.**

---

[9] As noted, this was a serious closing argument error by the government given that there was no other evidence that Ms. Overway had emphasized the WOSB issue to Mr. Smith other than this single attachment.

Nor could the government account—indeed, it did not even attempt to account—for the abundant other evidence demonstrating that (1) Mr. Myers deceived Mr. Smith regarding the WOSB requirements and Anne Robins's role at the company; or (2) Mr. Smith believed Mr. Myers's deceptive representations. That evidence includes, but is not limited to, the following:

- Mr. Myers's representation to Mr. Smith during his December 2013 interview that SDB was a WOSB until Ms. Robins sold her 51% ownership interest, GX 9;

- Mr. Myers's initial email on May 14, 2014 that SDB could "remain self-certified" by "transition[ing] Anne Robins as president of SDB over the duration of the ownership transfer," GX 35—even though Ms. Robins had retired in April 2013, as Mr. Myers well knew;

- Mr. Smith's email to Mr. Myers on July 25, 2014, proposing to promote the fact that Mr. Myers was "in control" of SDB *on SDB's public website*, and the response from Mr. Myers regarding "how to word Anne's retirement," "as she *will remain a key* stakeholder and most likely continue to sit on the board." GX 72 (emphasis added);

- The fact that Mr. Myers intentionally removed Mr. Smith from the August 19, 2014 "deal is done" email informing Mr. Eldredge that his purchase of Anne Robins's shares was now complete, DX 67;

- The fact that there was no evidence—none—of Mr. Myers (or anyone else) telling Mr. Smith about the August 2014 share purchase until sometime in 2015;

- Mr. Myers's email to Kevin Smith in January 2014 falsely stating that Anne Robins—who has resigned from the Board five months' earlier, GX 88—was still a "board member with a financial stake in the company's success." DX 70.

\* \* \*

The government never addressed Mr. Myers's deception of Mr. Smith. Most fundamentally, it did not explain *why* Mr. Myers would continue to represent falsely Anne Robins's role to Mr. Smith, *if not for the purpose of deceiving him regarding SDB's WOSB status*. This is precisely the kind of "missing, flawed, or contradictory facts" supporting the conclusion that no reasonable trier of fact could hold Mr. Smith guilty beyond a reasonable doubt. *Bonner*, 648 F.3d at 213.

**F.      The Testimony Of Mr. Smith Went Essentially Unchallenged By The Government.**

Finally, the Court should consider both the direct examination and cross examinations of the defendant, Mr. Smith. The defense called Mr. Smith, whose testimony took place over one day. Mr. Smith testified about every issue in the case, including his review and understanding of the May 14, 2014 email and his meeting with Ms. Overway. Mr. Smith's testimony—as well as all of the exhibits in the case generally—was entirely consistent with Mr. Smith's defense from when he was first questioned by federal law enforcement: that he believed in good faith that SDB could self-certify as a WSOB based on Ms. Robins's 51% ownership.

The truthfulness of Mr. Smith's testimony went essentially unchallenged by the government. The government's primary themes were instead to (1) highlight Mr. Smith's lack of interaction with Anne Robins, a fact that was irrelevant to Mr. Smith's defense and whether he understood both parts of the WOSB definition; (2) express great skepticism that anyone might not understand both parts of the WOSB definition, notwithstanding the fact that the government's cooperating witnesses, Anne Robins and Giff Eldredge, both testified that they similarly believed SDB to be a legitimate WOSB for many years (Robins—approx. 15 years; Eldredge—approx. 1.5 years), and that John Albert, who had been with the company since its founding in 1994, obviously thought so as well; (3) criticize Mr. Smith for delays in notifying various parties regarding SDB's change in status, even falsely conveying to the jury that this brief delay—as opposed to any knowing misrepresentation on Mr. Smith's part—was a basis for convicting Mr. Smith of wire fraud.[10]  *See, e.g.*, 8/2 (Smith) Tr. 202.

---

[10] This incorrect proposition of law was also prominently featured in the government's closing argument. Furthermore, both in the government's cross examination of Mr. Smith and in closing argument, the government falsely suggested that Jacobs did not find out about SDB's change of status until Mr. Smith's October 2015 email exchange with Annette Holmes, GX 148.  *See* 8/2 (Smith) Tr. 211 ("And it took for more months before you said anything in writing to Jacobs, right?  A:  In writing, yes.  That was the first time, but anyway, I did make calls."). Among other things, Mr. Smith had changed SDB's status in SAM many months earlier.

The government did not offer a single exhibit to impeach Mr. Smith regarding his understanding of the WOSB definition.[11] It did not offer a single exhibit where Mr. Smith represented, to anyone, that a woman was "in control" of SDB. It did not offer a single exhibit where Mr. Smith *lied about anything*. The government did not challenge Mr. Smith on his assertion that he was misled by Mr. Myers regarding when Ms. Robins had sold her 51% ownership interest in SDB to Mr. Myers and his brother, Mark Myers. It did not question Mr. Smith about his repeated representations, including to third parties and including for publication on SDB's website, that Mr. Myers controlled the company and how that comported with Mr. Smith's alleged understanding of the two-part definition for a WOSB.

The government's strategic choice to limit its cross-examination of Mr. Smith was telling and a recognition that, the more it questioned Mr. Smith about underlying events, the more apparent it became that Mr. Smith was being truthful.

## **CONCLUSION**

The government did not (and could not have) presented substantial evidence of Mr. Smith's guilt of conspiracy and wire fraud because Mr. Smith was innocent of the charges. Contrary to the jury's verdict on Counts 1, 2, and 3-7, the evidence is clear that Mr. Smith acted in good faith at all times. For this reason, the reasons discussed above, and any other reason appearing to this Court, Mr. Smith respectfully moves this Court to grant his motion for judgment of acquittal under Federal Rule of Criminal Procedure 29.

---

[11] The government's two aborted attempts at impeaching Mr. Smith—the "Crane Game" email, GX 136, and the PortCanaveral.com email—only underscored Mr. Smith's truthfulness. 8/2 (Smith) Tr. 206-07, 213-14.

Respectfully submitted,

_____ /s/ _____
Jonathan Jeffress (#42884)
Tony Miles (admitted *pro hac vice*)
Amelia J. Schmidt (admitted *pro hac vice*)
Jade Chong-Smith (admitted *pro hac vice*)
KaiserDillon PLLC
1099 Fourteenth St., N.W.; 8th Floor—West
Washington, D.C.  20005
Telephone: (202) 683-6150
Facsimile: (202) 280-1034
Email: jjeffress@kaiserdillon.com
Email: aschmidt@kaiserdillon.com
Email: jchong-smith@kaiserdillon.com

*Counsel for Defendant Kevin N. Smith*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of October 2021, the foregoing was served

electronically on the counsel of record through the U.S. District Court for the Eastern District of

Virginia Electronic Document Filing System (ECF) and the document is available on the ECF

system.

*/s/ Jonathan Jeffress*
Jonathan Jeffress