**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:20-CR-74 |
| Plaintiff, | The Honorable Anthony J. Trenga |
| v. | Motions Hearing: November 17, 2021 |
| KEVIN N. SMITH, | |
| Defendant. | |

**DEFENDANT KEVIN N. SMITH'S AMENDED MEMORANDUM**
**IN SUPPORT OF MOTION FOR A NEW TRIAL**

# TABLE OF CONTENTS

BACKGROUND ................................................................................................. 1

   A.   The Volume of Discovery—Five Million Pages—Which the Defense Could Not Meaningfully Search Until Two Months Before Trial ....................................... 2

   B.   COVID-19 and Mr. Smith's Trial ................................................................ 2

LEGAL STANDARD ....................................................................................... 3

ARGUMENT .................................................................................................... 4

   I.   The Weight of the Evidence Overwhelmingly Supported a Not Guilty Verdict ........... 4

      A.   No Evidence of a Conspiratorial Agreement .......................................... 5

         1.   Mike Myers ...................................................................................... 5

            a.   Mr. Myers's lies about the law (self-Certification v. formal certification) ....... 6

            b.   Mr. Myers's lies about Ms. Robins's role at SDB ............................. 7

         2.   Giff Eldredge ................................................................................ 8

            a.   Mr. Eldredge did not believe that he, Mr. Myers, and Mr. Smith were committing a crime in the May 14, 2014, email exchange. ............ 8

            b.   Mr. Eldredge could not point to any evidence of a conspiratorial agreement between Mr. Smith and Mr. Myers. .......................... 9

         3.   Anne Robins ................................................................................ 11

      B.   No Evidence Mr. Smith Acted Knowingly or With Any Intent to Defraud ............. 12

         1.   May 14, 2014, "Thin Ice" Email Thread ............................................. 13

         2.   No Evidence of Knowledge or Intent from Patricia Overway ............... 14

      C.   Witness Credibility ........................................................................... 18

   II.   The Interest of Justice Requires a New Trial Due to the Government's Significant Mischaracterization of Much of the Evidence ............................................. 25

      A.   Gifford Eldredge ............................................................................. 26

      B.   Mike Myers .................................................................................... 27

      C.   Patricia Overway ............................................................................. 28

      D.   Anne Robins ................................................................................... 30

      E.   Annette Holmes .............................................................................. 31

      F.   Mr. Smith's Knowledge about Government Set-Aside Contracts ............... 33

      G.   The Government Mischaracterized Mr. Smith's Testimony and His Theory of Defense ....................................................................................... 35

   III.   Denial of Mr. Smith's Request for Three-Month Continuance Significantly Impeded His Right to a Fair Trial ...................................................................... 36

      A.   Mr. Smith's consistent statements to Vencore and Jacobs ....................... 37

      1.    Communications Between Mr. Smith and Ms. Holmes (Jacobs) Just  Before the October 12, 2015, Emails ................................................................... 37

      2.    Communications with Vencore .......................................................... 38

  B.    Evidence that Mr. Eldredge and Mr. Myers Had a Dim View of Mr. Smith's Abilities and Skills ................................................................................... 40

IV.  A New Trial is Warranted Due to Improper Jury Instructions ..................................... 40

V.  A New Trial is Warranted Due to Improper Evidentiary Rulings ............................... 42

  A.    Mr. Eldredge's Plea Agreement Statement of Facts ................................................ 42

  B.    Government's Exhibit 52 .......................................................................................... 43

VI.  COVID-19-Related Issues Denied Mr. Smith a Fair Trial .......................................... 43

CONCLUSION ................................................................................................................................. 44

# TABLE OF AUTHORITIES

**Cases**

*Cheek v. United States*,
    498 U.S. 192 (1991).................................................................... 40

*Tome v. United States*,
    513 U.S. 150 (1995).................................................................... 42

*United States v. Arrington*,
    757 F.2d 1484 (4th Cir. 1985) ........................................... 4, 5, 18

*United States v. Devries*,
    630 F.3d 1130 (8th Cir. 2011) ........................................................ 4

*United States v. Henry Gifford Eldredge*,
    21-cr-30 (AJT) ............................................................................ 43

*United States v. Huerta-Orozco*,
    272 F3d 561 (8th Cir. 2001) .......................................................... 3

*United States v. Jennings*,
    438 F.Supp.2d 637 (E.D.Va. 2006) .............................................. 4

*United States v. Lincoln*,
    630 F.2d 1313 (8th Cir. 1980) ...................................................... 3

*United States v. Millender*,
    16-cr-239............................................................................ 8, 10, 11

*United States v. Myers,*
    21-cr-31 ......................................................................................... 6

*United States v. Reives*,
    15 F.3d 42 (4th Cir. 1994) .......................................................... 41

**Rules**

Fed. R. Crim. P. 29 .......................................................................... 1
Fed. R. Crim. P. 801(d)................................................................. 42
Fed. R. Evid. 801(d)(1)(B)....................................................... 42, 43
Fed. R. Evid. 901 ......................................................................... 43
Fed. R. Evid. 1002 ....................................................................... 43
Fed. R. Evid. 1003 ....................................................................... 43

**Regulations**

85 Fed. Reg. 27650 ......................................................................... 6

A new trial is warranted in Kevin Smith's case to remedy the miscarriage of justice that occurred during his jury trial.[1]  For the reasons set forth below, pursuant to Fed. R. Crim. P. 33, it is in the interests of justice to grant Mr. Smith a new trial.[2]

## BACKGROUND

The relevant factual and procedural background is largely set forth in Mr. Smith's Motion for Acquittal pursuant to Rule 29, which is being filed concurrently with this Motion, and therefore the defense incorporates it by reference herein and will set forth additional facts and/or relevant portions from the record that may relate to the individual arguments raised below.  In addition to the facts incorporated by reference from his Rule 29 Motion and set forth below, the defense briefly summarizes the concerns that it raised in the weeks leading up to trial that Mr. Smith would not receive a fair trial.

On May 14, 2021, the defense sought a continuance of the trial from its scheduled date of June 28 to October 2021, representing that it would need an additional 90 days to prepare for trial.  The defense further cited the ongoing pandemic and concerns about covid-19, particularly since Mr. Smith and many of the witnesses in the case would be required to travel from Florida. ECF No. 69.  The government opposed; following a hearing at which defense counsel affirmatively represented that the defense would be ineffective without a continuance, the trial court granted a 30-day extension to July 26.  ECF No. 77.

---

[1] The memorandum submitted by Mr. Smith on October 18, 2021, was submitted without a table of authorities and with errors in the table of contents.  This memorandum includes a table of authorities and with the errors in the table of contents corrected.

[2] Mr. Smith's motion for a new trial should be granted regardless of whether the court grants his motion for judgment of acquittal.  In accordance with Fed. R. Crim. P. 29, when a motion for judgment of acquittal is granted, "the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed."  If the judgment of acquittal is later reversed by an appellate court, conditionally granting a new trial motion will allow Mr. Smith's case to "proceed with the new trial unless the appellate court orders otherwise."  Fed. R. Crim. P. 29(d)(3)(A).

**A. The Volume of Discovery—Five Million Pages—Which the Defense Could Not Meaningfully Search Until Two Months Before Trial**

The electronic discovery provided in this case in and around November and December of 2020 was over 5 million pages and included documents produced to the government by numerous companies: USA, SDB, Qinetiq (now Vencore), and Jacobs.  Because of the long history involved in this case, many of those documents dated back twenty years.  Because Mr. Smith did not have the resources to afford an e-discovery database that many companies in white-collar cases are able to afford, the government provided the documents to the defense via an Eclipse Publish database which was only compatible with certain outdated versions of Windows[3] and proved extremely cumbersome to search, review, and identify relevant documents.  As a result, the defense was unable to search effectively for relevant evidence in the 5 million pages of discovery until the government produced *Brady* material in May 2021—seven months after it had produced the 5 million documents, and after at least two months of refusing to respond to the defense's requests for *Brady* material unless the defense agreed to certain pretrial stipulations.

**B. COVID-19 and Mr. Smith's Trial**

The court implemented some COVID-19 safety protocols at Mr. Smith's trial, including a masking requirement for unvaccinated persons and social distancing between jurors.  At the

---

[3] The government also led the defense to believe for months that *only* a Windows 7 computer—close to a decade old—would work with Eclipse.  The government represented to the defense that the database was compatible with Windows 7 and not with more recent versions.  On May 13, 2021, the government informed the defense for the first time that, contrary to what it had stated on October 30, 2020, the Eclipse Publish database can run on a Windows 10 computer.  In other words, the government not only undermined the ability of the defense to work on this case by withholding *Brady* material, it also undermined the defense's ability to search through the discovery by representing that the database would not work on Windows 10 computers when it in fact did.

outset of trial, the social distancing protocols caused some jurors to be unable to view witnesses and to have difficulty viewing monitors where exhibits were being displayed.  7/26 Tr. 91.  With regard to viewing witnesses, the court security officer reported that at least four jurors were unable to "see the witness in the witness box."  *Id*. at 108.

Monitors displaying evidence also were difficult for some jurors to see because the social distancing placed them too far from any monitor.  At one point, counsel for the government advised everyone about the problem by saying "I heard that it's too hard to see from that far away."  7/26 Tr. 89.  The Court later noted that jurors were "having difficulty seeing the screen," and asked whether the problem can be corrected by moving a screen.  *Id*. at 108.  The court security officer replied: "No, sir.  It is a very limited line."  *Id.*  The Court then asked about moving the witness box.  *Id.*  The court security officer then replied "[n]ot very far, sir."  *Id.*  After taking a recess to assess whether the situation could be resolved, the Court discontinued the social distancing protocol and moved all jurors into the jury box.  *Id*. at 109.  On the fifth day of trial, concerns about some jurors' ability to view the monitors was raised again.  The Court Security Officer told the Court that "[t]he jurors from that last monitor all the way down cannot see or hear. They can't see very well over here." 8/2 Tr. 264.

Finally, on the fifth day of trial, in response to the growing public concerns about the Delta variant, a new general order reinstituted social distancing and mask requirements in the courthouse.  8/2 Tr. 262.  The Court and counsel discussed the impact that the new general order would have on the ability of jurors to see and hear during closing arguments.  *Id.* at 262-265.

## LEGAL STANDARD

Fed. R. Crim. P. 33 permits the court to "vacate any judgment and grant a new trial if the interest of justice so requires."  Trial courts have "'wide discretion in deciding whether to grant a

new trial in the interest of justice.'" *United States v. Huerta-Orozco*, 272 F3d 561, 566 (8th Cir. 2001) (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).  In instances "where it is demonstrated that the fundamental fairness or integrity of the trial result is substantially in doubt," a trial court should exercise its discretion and grant a new trial.  *United States v. Jennings*, 438 F.Supp.2d 637, 642 (E.D.Va. 2006).

## ARGUMENT

The guilty verdicts returned by the jury in Mr. Smith's case on Counts One, Two, and Four through Seven are fundamentally unfair.  Because the guilty verdicts significantly undermined the integrity of Mr. Smith's trial, it is in the interest of justice to grant Mr. Smith a new trial.  The grounds for a new trial are set forth below.

### I.    The Weight of the Evidence Overwhelmingly Supported a Not Guilty Verdict

Trial courts may grant a new trial when the weight of evidence supports a verdict that is contrary to the verdict rendered by the jury.  *See United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985).  A new trial should be granted "[w]hen the evidence weighs so heavily against the verdict that it would be unjust to enter judgment."  *Id.*  Granting a new trial in such instances is an important tool that permits courts to guard against any miscarriages of justice.  *See United States v. Devries*, 630 F.3d 1130, 1132 (8th Cir. 2011).

The Court's role in deciding a new trial motion under Rule 33 is very different than its more limited role in deciding a motion to acquit pursuant to Rule 29.  *See Arrington*, 757 at 1485 (when a "motion attacks the weight of the evidence, the court's authority is much broader than when it is deciding a motion to acquit on the ground of insufficient evidence.").  In exercising this broader authority, the Court "may evaluate the credibility of the witnesses."  *Id*. Additionally, when deciding a motion for new trial, "the district court is not constrained by the

requirement that it view the evidence in the light most favorable to the government." *Id.* The Court's responsibility when considering a new trial motion is to determine whether granting a new trial is "in the interest of justice" and "[w]hen the evidence weighs so heavily against the verdict that it would be unjust to enter judgment, the court should grant a new trial." *Id.*

**A. No Evidence of a Conspiratorial Agreement**

Mr. Smith's sole named co-conspirator—Mike Myers—did not testify at trial. Instead, to prove that Mr. Smith had joined a conspiracy to commit wire fraud, the government relied on the testimony of two other cooperators:

(1) Giff Eldredge, who had never pled guilty to any conspiracy charge and, when presented with the one email exchange on which the government's case of an actual agreement between Mr. Smith and Mr. Myers hung, (a) testified that he had not believed that the parties involved were actually committing a crime when they were participating in that email exchange, and (b) could not point to any other interaction when he understood Mr. Smith or Mr. Myers to have agreed to commit a crime; and

(2) Anne Robins, SDB's figurehead woman owner, who was convicted of joining a separate conspiracy with Mr. Myers based on events that occurred years before Mr. Smith was even hired by SDB.

Neither of these witnesses provided testimony showing a conspiratorial agreement between Mr. Myers and Mr. Smith. Instead, their testimony—and other evidence at trial— showed that there was no agreement between Mr. Smith and Mr. Myers to commit fraud.

### 1. *Mike Myers*

Mr. Smith testified at trial that he never conspired with Mike Myers to commit fraud and that if he had ever understood Mr. Myers to have been asking him to commit fraud, he would have begun looking for a new job. 8/2 (Smith) Tr. 200. None of the government's witnesses

contradicted that testimony. And the government chose not to call the one witness who, presumably, would have been in the best position to testify about whether he thought he had a conspiratorial agreement with Mr. Smith—Michael Myers.

Indeed, the weight of the evidence showed that, rather than having an agreement with Mr. Smith, Mr. Myers lied to him about what the law required and whether Ms. Robins was a majority-owner of SDB. The evidence was clear that Mr. Myers was willing to lie about these things to anyone if it made him money, including Mr. Smith.

### a. Mr. Myers's lies about the law (self-Certification v. formal certification)

For many years—including the years that Mr. Smith worked at SDB—a company could self-certify as a WOSB or obtain a third-party certification confirming that it was a WOSB under the Federal Acquisition Regulations. *See* Small Business Administration, *Women-Owned Small Business and Economically Disadvantaged Women-Owned Small Business Certification*, 85 Fed. Reg. 27650 (May 11, 2020) (eliminating self-certification option). Although the requirements were the same regardless of which certification option a company opted to use, Michael Myers exploited this distinction. He misled other USA and SDB employees—including Mr. Smith—to believe that, as long as Ms. Robins owned 51 percent of SDB, that was sufficient for SDB to legally self-certify as a woman-owned small business.

It is undisputed that by November 2013—just before Mr. Smith interviewed for a job at SDB—Mr. Myers knew that self-certifying as a woman-owned small business required that the woman control the business and not just own it. *See United States v. Myers,* No. 21-cr-31, ECF 14 at 6. Mr. Myers lied to Mr. Smith about SDB's socioeconomic status during Mr. Smith's job interview with SDB in December 2013. And as discussed below, he lied to Mr. Smith about SDB's socioeconomic status in his May 14, 2014, email to Mr. Eldredge and Mr. Smith.

## b. Mr. Myers's lies about Ms. Robins's role at SDB

Not only did Mr. Myers mislead Mr. Smith about the law, he misled Mr. Smith about the facts. He withheld from Mr. Smith that (1) Anne Robins had retired nearly a year before Mr. Smith began at SDB; and (2) Anne Robins had sold her shares to him on August 19, 2014.

Anne Robins retired as president of the company in 2013, nearly a year before Mr. Smith even started at SDB. *See* GX 7. Mr. Myers lied to Mr. Smith about this fact. Mr. Myers wrote to Mr. Smith in his May 14, 2014, email that he will need to transition Anne Robins "as president." DX 54. He lied to him again in July of 2014 when he arranged a meeting between Mr. Smith and Ms. Robins at USA's Pennsylvania office when Ms. Robins had already retired from the company for more than one year. Mr. Myers continued lying to Mr. Smith in multiple emails in July and August 2014 about Ms. Robins's retirement, stating that she "*will* continue to serve on the board," GX 72, and "*will* exit" the company. DX 109 (emphasis added). Mr. Smith trusted his boss, and therefore did not understand that Ms. Robins had retired at the time that he certified SDB as a woman-owned small business in SAM and to NASA prime contractors.

More importantly, Mr. Myers lied to Mr. Smith about the one thing that Mr. Smith believed did matter to SDB's ability to self-certify: Ms. Robins's ownership of SDB. On August 19, 2014, he took Mr. Smith off of an email chain before sending a separate email to Mr. Eldredge: "Sdb was drained of $115,000 today for biz transfer. ***Deal is done***." DX 67 (emphasis added). Mr. Smith did not know about this email—or that Mr. Myers had purchased Ms. Robins's shares in August 2014, months before he told Mr. Smith he'd purchased them—until a few weeks before the trial. Mr. Smith testified about the effect that learning his boss had lied to him had had on him:

> I had a lot of trust in Mike . . . . [W]hen I first saw [the purchase agreement] . . . This is when I realized that I was used . . . I actually was depressed most of the day because . . . that's not how I saw him when I went to work for him or when I worked for him.

8/2 (Smith) Tr. 163.

## 2. *Giff Eldredge*

Mr. Eldredge was the COO of USA and SDB. *See* DX 98; 7/27 (Eldredge) Tr. 104. He had worked at USA—and directly with Mike Myers—since 2012. He held college degrees from Amherst and Williams College and had graduated from high school at Sidwell Friends in Washington, D.C. 7/27pm (Eldredge) Tr. 92-94. He also had prior experience with WOSBs. 7/27 (Eldredge) Tr. 94. He testified that for at least two years *he believed* Mr. Myers's claims about SDB legitimately representing itself as a self-certified WOSB. 7/27 (Eldredge) Tr. 91-92, 98, 127. And as this Court noted in granting a new trial in another conspiracy fraud case, evidence that an alleged chief conspirator was able to hoodwink relatively sophisticated individuals tends to show that a less sophisticated defendant would not have understood that (s)he was committing fraud. *See United States v. Millender*, 16-cr-239, ECF 203 (Memo Op. & Order) ("*Millender* Op.") at 13 (noting that "financially sophisticated individuals" were among those who were convinced by the chief conspirator that alleged fraud opportunities were legitimate) ("Even [a] convicted co-conspirator . . . a formerly licensed securities trader experienced in financial investments, initially thought that MEMO was a legitimate investment opportunity and that there was nothing improper about her involvement.").

Here is what Mr. Eldredge testified about his state of mind and his understanding of whether SDB was committing fraud during the period he worked at USA and SDB:

### a. Mr. Eldredge did not believe that he, Mr. Myers, and Mr. Smith were committing a crime in the May 14, 2014, email exchange.

The government argued that Mr. Myers's May 14, 2014, email to Mr. Eldredge and Mr. Smith was an invitation to join a conspiratorial agreement. 8/3 (closing) Tr. 25 ("At this point,

members of the jury, everybody on this e-mail thread is on notice that if they keep representing as a woman-owned small business, they are committing fraud."). But Mr. Eldredge's testimony was inconsistent with the government's theory and in fact corroborated Mr. Smith's testimony that they did not believe that they were committing a crime:

> Q.    . . . you don't say you're committing a crime, right?
>
> A.    Correct.   I don't say that.
>
> Q.    And did you think that at the time?
>
> A.    Did I think what?
>
> ***Q.***    ***Did you think you were committing a crime from here on out?***
>
> ***A.***    ***No.***
>
> ***Q.***    ***You didn't?***
>
> ***A.***    ***I don't think so, no.***

7/27 (Eldredge) Tr. 143-144 (emphasis added). This testimony about his understanding of the emails was the same as Mr. Smith's. *See* 8/2 (Smith) Tr. 103-16. And the government did not call Mr. Myers, the only other person on the email chain, to rebut either Mr. Eldredge's or Mr. Smith's testimony on this. Without anything more, the May 14, 2014, email exchange simply was not sufficient to show a conspiratorial agreement between Mr. Myers and Mr. Smith.

### b.    Mr. Eldredge could not point to any evidence of a conspiratorial agreement between Mr. Smith and Mr. Myers.

Following Mr. Eldredge's testimony about the May 14, 2014 email—specifically that he did not believe that he was committing a crime when he wrote the "thin ice" email—the government asked him a series of questions on redirect about interactions that he had with Mr. Myers and Mr. Smith, after the May 14 email exchange. Mr. Eldredge testified on redirect that, in subsequent meetings, Mr. Myers's "instruction" to him and Mr. Smith was "[t]hat SDB was

still a woman-owned small business until Mike Myers had purchased Anne's shares." 7/27 (Eldredge) Tr. 31.  Asked whether Mr. Smith had "agree[d] to go along with it . . . based on his subsequent words and actions," and upon objection from defense counsel, the Court instructed the government to rephrase the question:

> THE COURT:   I'll let [Mr. Eldredge] answer in response to – if we can testify as to anything that Mr. Smith affirmatively said along those lines.
> THE WITNESS:   I couldn't quite hear everything you said.
> THE COURT:   Yes.  If you could testify **based on anything Mr. Smith affirmatively said to you.**

7/27 (Eldredge) Tr. 31-32 (emphasis added).  Based on pretrial discovery reviewed by the defense, based on Mr. Eldredge's multiple proffers to law enforcement, and based on the testimony that Mr. Eldredge had given, all indicated that Mr. Eldredge in fact, could *not* testify to anything that Mr. Smith affirmatively said to him that would show that Mr. Smith had joined a conspiracy.  Presumably recognizing that—as discussed in more detail below—the government sidestepped that question and asked a series of different ones.

This is exactly the scenario that the Court found in *Millender* was insufficient evidence that a defendant had willingly joined a conspiracy.  In *Millender*, the Court granted a new trial and found that the weight of the evidence could not support a defendant's conviction for wire fraud conspiracy, where, during cross-examination of the key cooperating witness, "it became clear that at most, Mrs. Millender [had been] present during certain conversation between [the key cooperating witness] and [her husband and chief co-conspirator] concerning how to deal with lenders that had asked for repayment." *Millender* Op. at 18-19.  The Court in that case noted that "[m]ost of [the key cooperating witness's] testimony came in response to the Government's questions about communications or agreements that lumped Mr. and Mrs.

Millender together, and her responses did not specifically differentiate between communications between her and Mr. Millender, her and Mrs. Millender, or both together." *Id.* at 18.

So too here, Mr. Eldredge "did not identify any actual interactions with [Mr. Smith] or claim that [he] had any substantive involvement" in any of his law enforcement interviews—at least, not until it was apparent that Mr. Smith was going to be the only defendant proceeding to trial. *Millender* Op. at 18. And even then, other than the May 14, 2014 email exchange—which he testified he did not understand to mean they were committing a crime—Mr. Eldredge could not point to any specific conversations or discussions he ever had with Mr. Smith about SDB's status or defrauding the company.

### 3. Anne Robins

Anne Robins was the supposed figurehead owner of SDB, who testified that, from approximately 1996 until 2010—for nearly sixteen years—she had no idea that SDB was not a woman-owned small business. *See* 7/27 (Robins) Tr. 221, 237-239. And in contrast to Mr. Eldredge's inability to remember any specific discussions with Mr. Smith about misrepresenting SDB as a WOSB, Anne Robins *did* have those discussions with Larry Myers: she testified that, when she brought concerns to Larry Myers that SDB may not legally be a WOSB, the late Mr. Myers told her to "hold the status quo" and say nothing. 7/27AM (Robins) Tr. 221.

Ms. Robins testified that, for about six years, that is what she did: held the status quo and said nothing. She lied by omission, saying nothing to anyone about what she and Larry had discussed, and at least once affirmatively certified to a prime contractor that SDB was a woman-owned small business, knowing that in fact it was not. 7/27AM (Robins) Tr. 220. Six years later, when law enforcement officers interviewed her about SDB's fraud, she lied to them and provided a false affidavit. 7/27AM (Robins) Tr. 257; *see also* DX 75.

But before that happened, in 2013, she retired from SDB. And over a year later, when Mike Myers, Larry's son, asked her to come to USA's office and meet with Kevin Smith, she did so without question. 7/27AM (Robins) Tr. 250-251; *see also* DX 61. She met with Mr. Smith for approximately an hour, and never mentioned to him once that she had retired from SDB—or that she was planning to sell her ownership to Mike Myers within a month. *See* 7/27AM (Robins) Tr. 224-25, 263; 8/2 (Smith) Tr. 135-36. And she certainly did not tell Mr. Smith about her conversations with Larry Myers that SDB was not, in fact, a WOSB—she was staying silent and holding the status quo. *See* 7/27/AM (Robins) Tr. 240-41.

Although Ms. Robins pled guilty to a wire fraud conspiracy, she was not convicted of conspiring with Mr. Smith—only with Michael Myers. And she offered no evidence that Mr. Smith ever knowingly joined any conspiracy with anyone. Her testimony merely confirmed what no one disputed: (1) she had never run SDB; (2) she interacted with Mr. Smith exactly once in July 2014, and (3) they never discussed SDB's status or her ownership or control (or lack thereof) of the company. She offered no evidence about Mr. Smith's state of mind and no evidence that he ever knowingly joined any conspiracy with anyone.

### B. No Evidence Mr. Smith Acted Knowingly or With Any Intent to Defraud

To convict Mr. Smith of wire fraud, the government was required to prove in part, beyond a reasonable doubt, that he: (1) "knowingly devised or knowingly participated in a scheme or artifice to defraud"; and (2) did so with "the intent to defraud." Jury Instructions, ECF No. 145-6, at 55. "Knowingly" means that Mr. Smith must have acted "consciously and with awareness and comprehension and not because of ignorance, mistake or misunderstanding or other similar reason." *Id.* at 35. Significantly, "[a] person who makes, submits, or uses a statement or writing which that person believes to be truthful does not 'knowingly' make, submit, or use a false, fictitious, or fraudulent statement." *Id.* And "intent to defraud" means

that Mr. Smith acted "knowingly and with the intention or the purpose to deceive or to cheat." *Id.* at 58. Ordinarily, an "intent to defraud" is accompanied "by a desire or a purpose to bring about some gain or benefit to oneself or some other person or by a desire or a purpose to cause some loss to some person." *Id.*

The government's entire case as to these two elements rested on (1) the "thin ice" email thread; and (2) the testimony of Norma Patricia Overway. For the reasons discussed below, neither of these were sufficient to show that Mr. Smith acted knowingly or with intent to defraud. Moreover, weighing the credibility of Mr. Smith's own testimony about his state of mind against the credibility of the government's witnesses, it is even clearer that the weight of the evidence did not support a finding of guilt.

### 1. May 14, 2014, "Thin Ice" Email Thread

The May 14, 2014, "thin ice" email thread was the exhibit the government most relied upon in its case against Mr. Smith. The government claimed that, when he saw Mr. Eldredge's email, Mr. Smith understood SDB could not self-certify as a WOSB. But that email falls far short of proving he had such knowledge, for four reasons.

First, the email thread confirms that Mr. Smith genuinely believed at that time that there was a difference between "self" and "formal" certification. Mr. Smith's email agreeing that self-certification is SDB's "best option at this point" and offering to explore working with a local agency to change that status "if and/or when we want to seek formal certification" shows that he believed SDB qualified as a self-certified WOSB but not as a formally certified WOSB. GX 37. Mr. Eldredge's comment about this being "the first time [he has] seen the concept of 'self-certification' explained this way" also shows that Mr. Smith was far from the only one who held this mistaken belief. GX 38.

Second, Mike Myers's initial email in this thread clearly advised Mr. Smith and Mr. Eldredge that they need not be immediately concerned about SDB's WOSB self-certification status. Mr. Myers told them that there would be no change in status until Mr. Myers "discuss[es] plans to transition Anne Robins from president of sdb over the duration of the ownership transfer, which will take another three years."[4] GX 35. Mr. Myers then wrote that if he was "successful with [his] discussions this process would buy us time to consider our options as they pertain to WOSB." *Id.*

Third, Mr. Smith never indicated in that email that what he was reading had changed his understanding of the rules as applied to self-certifying WOSBs. He never stated that he had investigated whether SDB could self-certify as a WOSB. There simply is nothing in the "thin ice" email thread indicating that Mr. Smith believed that SDB did not qualify as a self-certified WOSB.

Finally, Mr. Smith's statements and actions after May 14, 2014, show that he continued to believe that SDB could legitimately self-certify as a WOSB even after the "thin ice" email thread. As discussed in more detail below, according to Patricia Overway, a former contract specialist at the Florida Small Business Development Center (SBDC), Mr. Smith continued to exhibit confusion about the WOSB rules well after the May 14 "thin ice" email when he continued representing to her through his statements, a business plan, and a draft capabilities statement that he believed that SDB was truly a WOSB.

### 2. *No Evidence of Knowledge or Intent from Patricia Overway*

The government also relied heavily on Norma Patricia Overway in its effort to prove that Mr. Smith acted knowingly. Contrary to the government's claim, Ms. Overway's testimony and

---

[4] Unbeknownst to Mr. Smith, Ms. Robins was no longer president of SDB by this time.

the exhibits admitted through her do not support any finding that Mr. Smith knowingly misrepresented SBD's socioeconomic status. Her testimony and the evidence admitted through her also fail to show that Mr. Smith acted with any intent to defraud. While Ms. Overway testified about whether she mentioned the WOSB criteria to Mr. Smith during their June 4, 2014, meeting, she was silent about Mr. Smith's knowledge concerning whether SDB qualified as a WOSB. She did not say that they talked about how the WOSB rules applied to SDB. She never said that there was any discussion about SDB not qualifying as a WOSB. She did not testify about any conversation she had with Mr. Smith about SDB changing its socioeconomic status. According to Ms. Overway, there was no back-and-forth exchange about the rules and Mr. Smith had no questions. 7/28 (Overway) Tr. 214. When asked by counsel for the government if she recalled "whether Mr. Smith verbalized anything about his understanding" of these rules, Ms. Overway said "No, I don't recall." *Id.*

The highlighted attachment to Ms. Overway's June 4, 2014, email that followed their meeting was not specifically intended for Mr. Smith or SDB. This highlighted attachment was merely a document Ms. Overway routinely sent to all clients who were affiliated with a potential WOSB. *See* 7/28 (Overway) Tr. 227-228, 247. In fact, as she explained to the jury, she highlighted the WOSB criteria on the attachment she sent to Mr. Smith before ever meeting him. 7/28 (Overway) Tr. 228. Ms. Overway offered no evidence indicating that she said anything to Mr. Smith about the relevance or importance of the highlighted attachment. And her email with the attachment does not mention the highlighted document, the WOSB rules, or any matter concerning SDB's WOSB status. *See* GX 52.

The guilty verdict in Mr. Smith's case is especially unjust because Ms. Overway provided plenty of evidence supporting his innocence. Through Ms. Overway, the jury was

informed that Mr. Smith truly believed SDB was a legitimate WOSB. Various statements Ms. Overway claimed Mr. Smith made and documents she said he showed her indicate that Mr. Smith believed SDB was a WOSB. For instance, according to Ms. Overway, after informing her that SDB was a WOSB during the time they met in April of 2014[5] and again during their June 4, 2014, in-person meeting,[6] Mr. Smith told her that SDB's woman owner lived out-of-state and "was not actively engaged in the business." 7/28 (Overway) Tr. 212. He also showed her an SDB business plan that represented both that SDB was a WOSB and Mike Myers was in control of SDB. 7/28 (Overway) Tr. 239-240; *see also* GX 45, 4. Surely, if Mr. Smith accurately understood the WOSB criteria and he was knowingly falsely representing SDB as a WOSB, he would not have told Ms. Overway that the woman owner was not actively engaged while also claiming that SDB was a WOSB. And he certainly would not have shown her a written business plan in which SDB was representing itself as a WOSB that was controlled by a man.

Ms. Overway's testimony offered powerful evidence that Mr. Smith remained unaware that SDB could not legitimately represent itself as a WOSB even after their June 4 meeting and her June 4 email. She testified that, five days after their in-person meeting and her email with the highlighted WOSB criteria attachment, Mr. Smith sent her a draft of his one-page capabilities statement for SDB. 7/28 (Overway) Tr. 232-234; *see also* GX 53. He asked her to review his draft capabilities statement and he sought her input. GX 53. The capabilities statement he sent began with the following single-sentence paragraph: "Founded in 1994, SDB Engineers & Constructors, a small *woman-owned business* located in Titusville, Fl., providing general

---

[5] Shortly after first meeting Ms. Overway, Mr. Smith sent her an email stating that "it was a pleasure meeting" her the previous day and he identified SDB as a woman-owned company. Tr. 209-210 (Day 3).
[6] During this meeting, Mr. Smith told Ms. Overway that the owner of SDB was a woman. Tr. 212 (Day 3). He also gave Ms. Overway a business plan which stated that SDB was a WOSB. Tr. 239-240 (Day 3); *see also* GX 45, 4.

construction, metal fabrication, painting & corrosion control, and project management services."
*Id.* (emphasis added). By characterizing SDB as a WOSB and displaying that designation so prominently, Mr. Smith must have continued to believe that SDB was truly a WOSB on June 9, 2014. Mr. Smith's misunderstanding about SDB's socioeconomic status was never corrected. Ms. Overway informed Mr. Smith that she was going to review his draft capabilities statement and "get back with [him]" the following week, but she does not recall ever informing Mr. Smith that his statement in the capabilities statement about SDB being a WOSB was wrong. 7/28 (Overway) Tr. 256-258; *see also* GX 56.

Statements Mr. Smith made to Ms. Overway and the materials he shared with her are particularly revealing considering the position she held at the time they interacted. Ms. Overway was a government contracting specialist. 7/28 (Overway) Tr. 207.[7] As a contracting specialist consultant, Ms. Overway provided "guidance and advice and training to companies who want to do business with either the federal, state, or local government." 7/28 (Overway) Tr. 207. Given Ms. Overway's position as a contracting specialist with a federal government sponsored agency, Mr. Smith would have been extraordinarily careful about sharing certain information with her if he knew SDB did not qualify as a WOSB. He would not have told her that SDB was a WOSB while also informing her that the out-of-state woman owner was not actively involved in running the business. He would not have sent her a single page capabilities statement that described SDB as a WOSB if he had understood from her that SDB did not meet the criteria for a WOSB. By disclosing Anne Robins's limited involvement in SDB and continuing to represent SDB as a WOSB in his draft capabilities statement, Mr. Smith's conduct with Ms. Overway convincingly

---

[7] As noted in the indictment, SBDCs are administered by the federal government's Small Business Administration (SBA). *See* Indictment, ECF No. 1, 3.

shows that he remained unaware that SDB did not meet the criteria for a WOSB after his June 4, 2014, interactions with her.

Overall, Ms. Overway did not offer any evidence at trial showing that Mr. Smith said or did anything to indicate that he understood that SDB was not a legitimate WOSB. Evidence that she exposed Mr. Smith to the WOSB rules is not proof that he understood those rules and that he knew SDB was not a genuine WOSB.[8] Ms. Overway did not reveal any conversation, email, memo, or other communication by Mr. Smith indicating that he understood that SDB was not a WOSB. She presented no evidence showing that she told Mr. Smith that SDB did not qualify as a WOSB or that she advised him to change SDB's socioeconomic status. The only evidence she offered concerning Mr. Smith's understanding of whether SDB qualified as a WOSB showed that Mr. Smith truly believed that SDB was a legitimate WOSB.

### C. Witness Credibility

The credibility of witnesses is a relevant factor to consider in determining whether Mr. Smith should get a new trial. *See Arrington*, 757 F.2d at 1485. As discussed in Mr. Smith's Motion for Judgment of Acquittal, there was insufficient evidence to support the guilty verdicts even when assuming the government witnesses were fully credible. Indeed, many of the arguments Mr. Smith makes about evidence of his innocence are based on the testimony of the government's main witnesses. However, there were instances when key government

---

[8]Mr. Smith may not have learned about the WOSB rules from Ms. Overway considering that she may not have discussed these rules with him, and he may not have read the highlighted portion of her email attachment. Ms. Overway's inability to sufficiently recall her meeting with Mr. Smith and her credibility issues creates significant doubt about whether she ever discussed the WOSB rules with him. Although there is no dispute about Ms. Overway emailing Mr. Smith an attachment with the WOSB rules highlighted, there is no evidence that Mr. Smith read the highlighted text—and given the volume of materials that she sent him, it is highly plausible that he did not.

witnesses—Ms. Robins, Mr. Eldredge, and Ms. Overway—embellished, exaggerated, or were not fully truthful, and that prejudiced Mr. Smith.

A significant credibility issue shared by Ms. Robins and Mr. Eldredge was the fact that their testimony was part of an arrangement they each had with the government. Prior to Mr. Smith's trial, Ms. Robins and Mr. Eldredge entered guilty pleas in which they agreed to cooperate with the government. Testifying at Mr. Smith's trial fulfilled part of Ms. Robins's and Mr. Eldredge's obligations under their cooperation plea agreements. *See* GXs 158 & 161. The danger concerning the credibility of cooperating witnesses is well known. Indeed, the jury was instructed by this court that testimony from such witnesses "is always received with caution and weighed with great care." Jury Instruction No. 28, 34, ECF No. 145-6.[9]

Ms. Robins had some additional credibility problems. While she did not actively perpetuate the fraud to the degree that Larry and later Mike Myers did, the evidence showed that she had a pattern of lying to protect her own interests. Ms. Robins admitted that she followed her boss (and longtime boyfriend's) instruction not to say anything to anyone about the fact that SDB was not legally a WOSB. 7/27AM (Robins) Tr. 221. And knowing that SDB was not a WOSB, she certified to Vencore that it was. *Id.* And she stayed completely silent about this fraud for six years, until law enforcement agents came to her door in 2016—and after that, she lied, perjured herself in a false affidavit that she had never certified SDB as a woman-owned small business. *Id.* at 256-57; DX 75 (Robins Affidavit).

One major issue concerning Ms. Overway's credibility was whether she was truly able to recall discussing the WOSB rules with Mr. Smith. During cross-examination, she acknowledged not recalling various details about her in-person meeting with Mr. Smith seven years earlier. She

---

[9] Also applicable to Ms. Robins's and Mr. Eldredge's credibility, was the court's instruction on witnesses with a felony conviction. *See* Jury Instruction No. 24, 30, ECF No. 145-6.

revealed that, in an effort "to err on the side of caution," she told government agents during an investigative interview a year earlier that she did not remember whether she discussed the WOSB rules with Mr. Smith. 7/28 (Overway) Tr. 222. During an interview about two weeks before trial, Ms. Overway told the government that she "does not remember if she met KS on 6/4/14 specifically." Mot. Ex. 1, 2 (Lee Bacon's interview notes).[10] Despite having previously told the government that she was unable to recall whether she met with Mr. Smith on June 4, 2014, and whether they ever discussed the WOSB criteria, Ms. Overway testified at trial that she discussed the WOSB rules with Mr. Smith on June 4, 2014. 7/28 (Overway) Tr. 219. She said she could recall this discussion with Mr. Smith at the time of her testimony because her memory had been "refreshed" after reviewing documents relating to the case. *Id.*

There were other critical aspects of her testimony that had apparently been recently "refreshed." During her initial investigative interview, Ms. Overway told government agents that she "did not recall Smith talking about or mentioning the woman owner of SDB during their June 4, 2014, face-to-face meeting, or in any other discussion after that." Mot. Ex. 2, 4 (William K. Shores interview memo). She also told them that she "was not familiar with Robins' name" and that "[s]he could not recall Smith telling her Robins was the President of SDB." *Id.* at 6. Yet, at trial, Ms. Overway testified that Mr. Smith mentioned Anne Robins during their June 4 in-person meeting and he said that Ms. Robins "lived in Pennsylvania." 7/28 (Overway) Tr. 212. Ms. Overway further testified that Mr. Smith said Ms. Robins "was the owner of the business, but she was not actively engaged in the business." *Id.*

---

[10] Various memoranda and notes of witness interviews with law enforcement were provided to the defense by the government in discovery and are marked "For Official Use Only." The defense will provide copies of Exhibits 1, 2, 3, 4, 10 to the Court and the government under separate cover.

Ms. Overway's June 4, 2014, email to Mr. Smith provides an additional basis for doubting whether she discussed the WOSB rules with him during their in-person meeting earlier that day. Her email informs Mr. Smith that "[i]t was a pleasure discussing government contracting with" him earlier that day. GX 52. She states that she has attached documents and asks Mr. Smith to make some specific observations. *Id.* She asks Mr. Smith to access SAM and update SDB's "SBA profile to show (a) capabilities narrative, (b) bonding capacity, (c) show more key phases/words relating to your core competencies, and (d) update performance history." *Id.* Significantly, her email states nothing indicating that she and Mr. Smith ever discussed the WOSB rules during their in-person meeting.

While Ms. Overway seemingly had no reason to favor either side in this case, she exhibited clear pro-government bias both before and during trial. Ms. Overway met government officials, including counsel for the government, on at least five separate occasions prior to her trial testimony. At the beginning of her first interview, Ms. Overway did not seem to have an unfavorable opinion about Mr. Smith. She spoke about "developing a good rapport with Smith" and she recalled his draft capabilities statement "because it was one of the few drafts that actually followed her instruction and advice." Mot. Ex. 2. After agents showed Ms. Overway various documents that were unrelated to her communications with Mr. Smith,[11] her opinion about Mr. Smith appeared to have significantly changed. Toward the end of the interview, she told the government that Ms. Robins's resignation letter "would have been a red flag had she seen it because of Robins' address in Pennsylvania." Mot. Ex. 2. She also said that "Robins' resignation conflicted with a WOSB requirement that the woman have day-to-day control of the

---

[11] Documents shown to Ms. Overway included Anne Robins's April 19, 2013, resignation letter, and Gifford Eldredge's May 14, 2014, "thin ice" email.

business." *Id.* Concerning the "thin ice" email, Ms. Overway "stated it was clear from the email that Smith knew they didn't qualify as a WOSB." *Id.*

Ms. Overway's unwillingness to acknowledge the obvious existence of key signs indicating that Mr. Smith did not realize that SDB was not a legitimate WOSB even after June 4, 2014, also damaged her credibility. During trial, she refused to acknowledge any significance in Mr. Smith's sending her a capabilities statement on June 9, 2014, that prominently represented SDB as a WOSB. Rather than admit that Mr. Smith's capabilities statement indicates that he continued believing that SDB was a WOSB, Ms. Overway made a false statement in an apparent effort to minimize this powerful evidence of Mr. Smith's innocence. She falsely claimed that Mr. Smith should have known that SDB was not a WOSB at the time he sent her the capabilities statement because they "would have talked about the criteria" in her email. 7/28 (Overway) Tr. 235. As mentioned previously, they did not discuss the criteria because that topic was not addressed in Ms. Overway's June 4 email. And Ms. Overway admitted on cross-examination that she was not aware of any email correspondence with Mr. Smith where she informed him that SDB did not qualify as a WOSB. 7/28 (Overway) Tr. 258. During her refusal to acknowledge the significance of Mr. Smith's draft capabilities statement, Ms. Overway went so far as to absurdly claim that she did not see Mr. Smith's draft capabilities statement despite having earlier testified how impressed she was with that document. Earlier on cross examination, the following exchange occurred between defense counsel and Ms. Overway:

> Q. And you remember Mr. Smith in large part because of this Capability Statement. Isn't that true?
>
> A. Yes. Because I would send the template to many businesses, and it would take three, four, maybe more iterations for them to produce what I believed was a really good Capability Statement that the business had. That's one of the reasons I kind of remembered him, because it's, like, whoa, this is really good.

Q. He followed your advice?

A. Yes.

Q. Followed your template?

A. Yes.

7/28 (Overway) Tr. 252. Later, when confronted about how Mr. Smith's continued representation of SDB as a WOSB in his draft capabilities statement shows he still believed SDB was a legitimate WOSB even after June 4, 2014, this exchange happened:

> Q. And when you met with the government all those times and they showed you all those emails, you didn't see any emails by you telling him: Oh, whoa, whoa, you can't do that, Mr. Smith, cannot represent yourself as a woman-owned small business. You didn't see any of those emails, did you, from you?
>
> A. No, but I also did not -- this is the first review of the Capability Statement. I did not see that either.

7/28 (Overway) Tr. 258.

Mr. Smith, on the other hand, was very credible. He had never been convicted of a crime at the time of his testimony. He had not entered into any agreement with the government or any other party that would have potentially given him a motive to fabricate. He had no financial incentive or any other motive to commit the crimes with which he was charged. There was no evidence of any cash payments, kickbacks, or any other benefit Mr. Smith received for his alleged involvement in the fraud scheme. Given the lack of any benefit to Mr. Smith and the grave consequences he faced if caught committing wire fraud, Mr. Smith's testimony about his innocence was very credible.

Mr. Smith's testimony at trial was believable and consistent. In fact, there were no inconsistencies with his testimony during trial. There were also no inconsistencies between his trial testimony and statements he made previously to law enforcement officers in 2016. Mr.

Smith's version of what occurred and what he knew has never changed. He first spoke with law enforcement agents on the same day that USA and SDB's offices were searched. 7/28 (Mazzella) Tr. 171-172. His interview was voluntary, and he provided so much information that the agent's notes of this interview are twelve pages. 7/28 (Mazzella) Tr. 173. Mr. Smith never asked to speak with an attorney, and he never asked a question that suggested he was worried. *Id*. One of the interviewing agents agreed that Mr. Smith "had zero time to prepare for an interview," or to speak with anyone about the matter that they were investigating. 7/28 (Mazzella) Tr. 187. During this initial interview, Mr. Smith did not tell agents that Ms. Robins was involved in the day-to-day operations of SDB. He told them that she did not participate in SDB's weekly telephone conferences, negotiate contracts, or prepare proposals. 7/28 (Mazzella) Tr. 161. He told them that he had no direct contact with Ms. Robins. 7/28 (Mazzella) Tr. 176. He did not deny certifying SDB as a WOSB in 2014 in SAM. 7/28 (Mazzella) Tr. 162. He explained his understanding that SDB could legitimately self-certify as a WOSB. 7/28 (Mazzella) Tr. 181. He said that he understood that Ms. Robins sold her shares to Mike and Mark Myers in 2015. 7/28 (Mazzella) Tr. 176-177. After the sale of her shares in 2015, Mr. Smith said, he understood that SDB could no longer legitimately represent itself as a WOSB. 7/28 (Mazzella) Tr. 177-178. Mr. Smith told the agents that he updated certifications in SAM, with Jacobs, and with Vencore to reflect that SDB was no longer a WOSB after learning that Ms. Robins sold her shares. 7/28 (Mazzella) Tr. 178, 179-180. Mr. Smith repeated the same version of events when he met with agents four months later[12] and when he testified at trial in 2021.

After evaluating the credibility of the witnesses at Mr. Smith's trial, the weight of the evidence tilts even more strongly in Mr. Smith's favor. Mr. Smith – who was the only witness

---

[12] *See* 7/28 (Mazzella) Tr. 163.

who testified for the defense – was a very credible witness. Ms. Robins and Mr. Eldredge had agreements with the government that significantly compromised their credibility. Ms. Overway had difficulties recalling critical events and the government clearly had considerable influence over her testimony. The government's main witnesses simply were not as credible.

## II. The Interest of Justice Requires a New Trial Due to the Government's Significant Mischaracterization of Much of the Evidence

The government had the burden of proof that Mr. Smith *knowingly* participated in a fraudulent scheme and that he did so with the *intent* to defraud. Yet throughout the trial, the government diverted the jury's attention from what it actually had to prove—i.e., Mr. Smith's knowledge and intent—to evidence that was irrelevant to Mr. Smith's state of mind.

The government told jurors repeatedly that Mr. Smith was guilty based on what he read, said, and signed. At the very beginning of its opening statement, the prosecutor said "[t]he evidence of the defendant's guilt in this trial will focus on … what the defendant read, what he said, and what he signed." 7/26 (opening) Tr. 44. The government went back to this phrase at least fourteen times during the trial: that Mr. Smith "read it, he said it, and he signed it." 7/26 (opening) Tr. 57-58; 8/3 (closing) Tr. 3, 16, 30, 40, 110. But by placing so much emphasis on what Mr. Smith read, said, and signed rather than on what he knew and understood, the government distracted jurors by drawing their attention away from the actual elements of wire fraud. The government misled and confused jurors about what the government was obligated to prove in order to find Mr. Smith guilty.

And it compounded the error by repeatedly misstating the evidence that it diverted the jury's attention towards to prove Mr. Smith's knowledge and intent. While both parties are entitled to interpret evidence for the jury in arguments, they are not allowed to make statements that are simply not accurate

## A. Gifford Eldredge

As already discussed, Gifford Eldredge offered no evidence at trial that supported the guilty verdicts returned by the jury. He did not provide any evidence of any conspiratorial agreement between Mr. Smith and Mike Myers. And as discussed above, he provided no evidence indicating that Mr. Smith acted knowingly or with any intent to defraud.

As a result, the only way the government could make any sort of case through Mr. Eldredge that Mr. Smith knowingly joined any conspiracy was to introduce statements from a document that was undoubtedly drafted by the government—a backdoor effort to attribute to Mr. Eldredge statements he was unwilling to make at trial. Specifically, the government read that Mr. Eldredge had "knowledge of the actual commission of a felony cognizable by a court of the United States," including "conspiracy to commit wire fraud," and that he took "affirmative action to conceal" the crimes about which he was aware. 7/28 (Eldredge) Tr. 105-106. The government also read that "[f]rom at least May 2014 through at least July 2016. . . Mr. Eldredge knew Michael Myers and Kevin Smith conspired with each other and others to defraud." 7/28 (Eldredge) Tr. 106. The government gave jurors the impression that these statements were written by Mr. Eldredge by using the phrase "where you say" when reading the Statement of Facts to Mr. Eldredge. 7/28 (Eldredge) Tr. 105 & 106.

The statements in the Statement of Facts were likely written by government prosecutors and are part of Mr. Eldredge's plea agreement. As discussed *infra*, those statements should not have been admitted at trial. But using the Statement of Facts associated with Mr. Eldredge's plea agreement in this manner also misled jurors about Mr. Eldredge's testimony and resulted in a grave miscarriage of justice. And the government capitalized on that by misstating during closing argument that Mr. Eldredge had testified that Mr. Smith had an agreement with Mr. Myers and that Mr. Smith knew SDB was not a legitimate WOSB:

- "After this point, after May, it's their lie together with Gifford Eldredge. Gifford Eldredge told you . . . I read this article; I participated in this e-mail exchange. After that point, I couldn't believe what Michael Myers had been saying before that. Everybody on this e-mail thread knew." 8/3 (closing) Tr. 31; and

- "Well, maybe Gifford Eldredge, he's just, you know, making things up. When he says, we agreed to do that, we all agreed to keep representing, that he's -- he's just making up that testimony." 8/3 (closing) Tr. 33.

## B. Mike Myers

The government also misled jurors by telling them that Mr. Myers said things he never said and did things he did not do. During its opening statement, the government told the jury:

> And yet, as you'll hear, Mike Myers did not tell Mr. Eldredge and the defendant to stop representing SDB as a woman-owned small business. Instead, he directed them to keep going, to try to win more business, to proceed as usual. And that, members of the jury, is exactly what Kevin Smith agreed to do.

7/26 (opening) Tr. 52. Mike Myers, however, never testified, so the jury never heard from Mr. Myers what he did or did not tell anyone. Instead, the government relied on the May 14, 2014, email exchange, and misstated what Mr. Myers actually wrote in the email—claiming that Mr. Myers told Mr. Smith that SDB was not a WOSB:

- "[T]his is him saying it in an e-mail about how to qualify" (8/3 (closing) Tr. 18);

- "We don't qualify as a woman-owned small business. Michael Myers had just said that in the e-mail." (8/3 (closing) Tr. 21);

- "[T]his is Michael Myers literally saying the truth about the WOSB definition, letting Kevin Smith in on the fact that they don't qualify." (8/3 (closing) Tr. 31).

The government's arguments about what Mr. Myers allegedly told Mr. Smith in his May 14, 2014, email outright misstated what the email said. Mr. Myers's email began with a discussion about what could be done to allow SDB to "***remain*** self certified" GX 35 (emphasis added). If Mr. Myers was letting Mr. Smith in on his fraudulent scheme, he would have let him know that SDB cannot possibly "remain" a self-certified WOSB because it never was a WOSB.

And he implied that SDB could continue to legitimately self-certify as a WOSB for some time –
possibly for another three years – because the process of transferring Ms. Robins's shares
"would buy us time to consider our options as they pertain to WOSB." *Id.* Even though he
knew Ms. Robins had resigned in 2013, Mr. Myers wrote in his email that he needed to "discuss
plans to transition Anne Robins from president of sdb"—again, lying to Mr. Smith that she was
still president—"over the duration of the ownership transfer." *Id.*

### C. Patricia Overway

Without Mike Myers's testimony, and without any testimony from Mr. Eldredge that
would prove that Mr. Smith understood the WOSB requirements through the May 14, 2014,
email, that left the testimony of Ms. Overway, who had met with Mr. Smith and who claimed—
at least at trial—to have discussed the requirements of the WOSB program with him.

Throughout the trial, the government mischaracterized, exaggerated, and distorted
evidence in connection with Ms. Overway. During its opening statement, the government told
jurors that they "will hear" evidence that "the defendant said that SDB did not qualify" as a
WOSB during a meeting with Ms. Overway in June of 2014. 7/26 (opening) Tr. 55.

This claim was false. Mr. Smith never made such an incriminating statement to Ms.
Overway, and Ms. Overway herself made that clear. According to Ms. Overway, while Mr.
Smith informed her that SDB's woman-owner was not very involved with the business, he
nevertheless consistently classified SDB as a WOSB. *See* 7/28 (Overway) Tr. 210, 212, 221-222,
234-235, 239-240, and 260-261; GX 53 (draft Capabilities Statement); and GX 45 (SDB
Business Plan). And the government could not have reasonably believed at the time of opening
statements that Ms. Overway would say that Mr. Smith had told her that SDB was not a WOSB.
Ms. Overway had met with representatives from the government in connection with Mr. Smith's
trial at least five times. She never told them that Mr. Smith ever said that SDB did not qualify as

a WOSB—even though she was repeatedly asked during these interviews whether Mr. Smith had said anything to indicate that he knew SDB was not a WOSB.

Then, during closing, the government claimed that in her June 4, 2014, email Ms. Overway "had highlighted for him the very definition that made it clear that SDB was a scam." Tr. 109 (Day 6). This was completely false. Ms, Overway unequivocally stated that she had highlighted the definition before she had ever met Mr. Smith:

> Q. In fact, you highlighted those portions of that document before you even met Mr. Smith. Right?
>
> A. Yes. It's a document that I kept.
>
> Q. Yeah, and you had it highlighted before you met Mr. Smith?
>
> A. Yes. But again, ***it's just to make sure that the client understands the rules, regardless of when it's highlighted.***

7/28 (Overway) Tr. 228 (emphasis added). There was no special or unique reason why Ms. Overway sent the highlighted WOSB definition to Mr. Smith. She herself testified that she routinely sent the highlighted definition to all clients that were potentially WOSBs:

> Q. That highlight portion is what you also send out to other woman-owned small business clients. Right?
>
> A. Yes. Yes. Because I want them to completely understand the eligibility criteria. So not only do I discuss that with them, but I highlight it to make sure it's clear.

*Id.* The government also misled the jury through its Exhibit 52, which arranged the attachments Ms. Overway sent in her June 4, 2014, email to Mr. Smith in the wrong order. Government's Exhibit 52 displayed the highlighted WOSB definition attachment as the first attachment to this email. As discussed below, that exhibit should not have been admitted. But as Defendant's Exhibit 102 showed, the WOSB definition attachment was not actually the first attachment. But because the government had so little else to build its case, it insisted upon admitting Exhibit 52,

because it manufactured false prominence and importance to the highlighted WOSB definition. This false portrayal undoubtedly misled and confused jurors into believing that it was more likely that Mr. Smith had read the WOSB definition.

The government also misled the jury by suggesting that Ms. Overway told Mr. Smith to access the SAM system to correct SDB's false WOSB designation. During closing argument, counsel for the government told jurors that Ms. Overway said to Mr. Smith that "I want you to access SAM." 8/3 (closing) Tr. 28. But there was no evidence that Ms. Overway ever told Mr. Smith to do that to change the WOSB status. In fact, the evidence at trial convincingly shows that Ms. Overway suggested that Mr. Smith access SAM for a variety of reasons that were all unrelated to SDB's WOSB designation. Ms. Overway's email instead suggested that Mr. Smith access SAM to "[u]pdate your SBA profile to show (a) capabilities narrative, (b) bonding capacity, (c) show more key phrases/words relating to your core competencies, and (d) update performance history." GX 52. And by accessing SAM the day after meeting with Ms. Overway and not changing SDB's WOSB status, Mr. Smith simply did as she told him. But because the government misstated what Ms. Overway actually told Mr. Smith, it misled the jury into believing that she had told him to access SAM to change its WOSB status.

### D.  Anne Robins

The government also used Ms. Robins to misled jurors about what Mr. Smith knew about her involvement with SDB. Ms. Robins testified that she only met with Mr. Smith once, and that the meeting occurred in Pennsylvania on July 8, 2014. 7/27AM (Robins) Tr. 224-225. She said the topic of selling her SDB shares to Mike Myers came up during her meeting with Mr. Smith. 7/27AM (Robins) Tr. 225. When asked what she recalls "about that," Ms. Robins replied: "[T]he following month the sale was to take place fully." *Id.* When asked later about whether the sale agreement concerning her shares was "openly discussed" during her meeting with Mr.

Smith, Ms. Robins said "I -- no, not openly, no. No."  7/27AM (Robins) Tr. 263.  But then the prosecutor asked, "But did Mr. Myers have a copy of it there with you and Mr. Smith?"  And Ms. Robins responded, "Yes, sir, he did."  *Id*.

This testimony from Ms. Robins about her draft sales agreement was carefully crafted to suggest that Mr. Smith was informed on July 8, 2014, that she was about to sell her shares to Mike Myers.  While her testimony is vague about whether the sale of her shares was discussed during her meeting with Mr. Smith, she suggested that a copy of the sales agreement was shown to both Mr. Myers and Mr. Smith, without ever saying that Mr. Smith *saw* any copy of a sales agreement.  The government gave the false impression that Mr. Smith would have known in July of 2014 that Michael Myers was about to own a majority of SDB.

Finally, the government's statements in closing about Anne Robins' retirement were yet another example of its efforts to distract the jury from what mattered: Mr. Smith's state of mind.  The government told jurors during closing argument with regard to Ms. Robins's retirement that "the point is not whether they listed her that way. The point is whether she was."  8/3 (closing) Tr. 19.  But that was not the point—the point was whether Mr. Smith *knew* she was.

### E.  Annette Holmes

The government misled the jury by claiming that Mr. Smith falsely represented SDB's socioeconomic status to Jacobs as late as October of 2015.  During its rebuttal, the government argued that, despite evidence that Mr. Smith knew in April of 2015 that Anne Robins had retired and SDB was not a WOSB, Mr. Smith was "put on his back heels" and did not honestly represent SDB's WOSB status when communicating with a representative from Jacobs six months later.  8/3 (closing) Tr. 104-105.  The government argued that Mr. Smith made a false representation to Jacobs in October 2015 "because he knows that when he's talking to people

who are in a position where they might sniff out what's happening, he has to say just enough to throw them off the scent." *Id.* at 105.

The government's claim that Mr. Smith was dishonest with Jacobs in October of 2015 about whether SDB was a WOSB is based on an email Mr. Smith sent to Jacobs' subcontract specialist Annette Holmes on October 12, 2015. In the email, Mr. Smith wrote that Anne Robins "is retiring" even though he was aware that she had already retired. Mr. Smith further stated that "Mike and Mark are in the process of buying her shares" and that he believes "this transaction will take place over the next three years." GX 148.

But a review of Mr. Smith's entire October 12 email plainly shows that he was doing the opposite of what the government stated. In the email, Mr. Smith was informing Jacobs that Anne Robins was no longer SDB's owner ***and that SDB was not a WOSB***. He told Ms. Holmes in the email that Anne Robins "***was*** the 51% owner" and that he "***removed the woman-owned status***." GX 148 (emphasis added). He also told Ms. Holmes that he had updated the org charts, capabilities statement, and SDB's company brochure to "reflect the change" in SDB's socioeconomic status. And as the following exchange shows, Annette Holmes testified that she understood from Mr. Smith's email that he was informing her that SDB was no longer a WOSB:

> ***Q You understood from that email that Kevin was no longer certifying that SDB was a woman-owned business, correct?***
>
> ***A Yes.***

7/26 (Holmes) Tr. 170. By telling the jury that Mr. Smith's October 12 email was an effort "to throw them off the scent," the government implied that Mr. Smith had done nothing up to that point to notify Jacobs that it was no longer claiming WOSB status. This implication is false because Mr. Smith removed the WOSB designation when completing SDB's recertification in

SAM in June of 2015.[13]  As Ms. Holmes herself testified and told law enforcement, she

routinely verifies a company's status in SAM, and that Jacobs relies on SAM more than any

other source when making determinations about a company's socioeconomic status.[14]  7/26

(Holmes) Tr. 166-167.  And Mr. Smith put Jacobs on notice about SDB's changed WOSB at

least four months prior to his October 2015 email to Ms. Holmes.

### F.  Mr. Smith's Knowledge about Government Set-Aside Contracts

The government also misled and confused jurors about Mr. Smith's knowledge about

government contracts.  Throughout the entire trial, the government presented Mr. Smith as

someone with specialized expertise in government contracts.  During opening statements, the

government characterized Mr. Smith as someone with "an extensive background in federal

contracting."  7/26 (opening) Tr. 45.  The government elicited testimony from Mr. Eldredge that

Mr. Smith seemed "very" familiar with government contracts when he interviewed for the

general manager position at SDB.  7/27AM (Eldredge) Tr. 310.  Mr. Eldredge testified that Mr.

Smith "seemed to understand well more than I did, and I was learning through the interview

process with him about government contracts.  And he had an understanding of how to pursue

them, how to bid them, how to win them."  *Id.*  But that is not evidence that Mr. Smith knew

about the WOSB regulations, and Mr. Eldredge never testified that he did.

---

[13] *See* GX 142.

[14] The government was well aware of how heavily Jacobs relied on information in SAM based on interviews it had with Ms. Holmes and another Jacobs subcontract administrator.  In a December 11, 2018, interview with Deidra Whelan and Annette Holmes, despite the existence of an internal Jacobs certification process, "[b]oth Whelan and Holmes stated that SAM was the only thing Jacobs relied upon in determining a subcontractor's size or socioeconomic status."  *See* Mot. Ex. 3.  On February 21, 2020, Ms. Holmes told a government agent "that as part of her duties as the subcontract administrator she would have verified SDB's status in SAM as part of the subcontract approval process."  *See* Mot. Ex. 4.

The government also introduced Mr. Smith's resumé and argued that statements in his resumé about his contracting experience are proof that he knew SDB was not a legitimate WOSB. During closing argument, after discussing Mr. Smith's resume, the government told the jury that "[t]he real Kevin Smith here, members of the jury, is the one who made a knowing deliberate choice to participate in this fraud." 8/3 (closing) Tr. 39. In the rebuttal part of its closing, the government argued that Mr. Smith's resume shows that he "has such a depth of experience, such clarity of vision, such a firm understanding of the government contracting process." *Id.* at 108. Based on this experience, government counsel rhetorically asked the jury:

> Is it possible that somebody with Kevin Smith's depth of experience and knowledge didn't understand what the words "I am submitting this under the penalty of law, representing that the representations and certifications are accurate, current, and complete" meant? . . . [I]s it possible to believe that somebody who would write that on his resumé didn't understand a one-page form with a definition that said a woman had to control the business when it was put in front of his face?

*Id.* at 109-110. But Mr. Smith's resume never stated that he had any expertise, or even any familiarity, with WOSB contracting or any other type of set-aside contracting. His resume listed experience only with "contract management." *See* GX 170.

While Mr. Eldredge may have claimed that Mr. Smith seemed familiar with government contracting before beginning his employment with SDB, Mr. Eldredge developed a very different understanding about Mr. Smith's knowledge and job performance after Mr. Smith had worked for SDB for some time. In an email thread about an assessment of SDB's performance in October of 2015, Mr. Eldredge observed that Alle Bechtel, an accountant he and Mr. Myers had asked to travel to SDB to help with billing issues, and Sabrina Kidd, a former SDB employee, both seemed to "have a low opinion of [Mr. Smith's] skills and abilities." Mot. Ex. 5 (Recap from Trip to SDB email). Ms. Bechtel had also written that she had "a low opinion of his abilities specific to being a GM. . . ." *Id.* Mike Myers later informed Mr. Eldredge that Ms.

Bechtel's comments about Mr. Smith appeared "in line with what I expected especially her assessment of Kevins (sic) management skills at the office." *Id.* Mr. Myers then stated that "I think our plan to move Kevin away from day to day management and over to client services makes even more sense. . . ." *Id.* Three months later, in January of 2016, Mr. Eldredge made the following comment in an email about a potential SDB general manager candidate who could replace Mr. Smith: "I'd see him as someone to replace Kevin outright, and someone who is capable of everything we originally expected out of Kevin."[15] Mot. Ex. 6.

### G. The Government Mischaracterized Mr. Smith's Testimony and His Theory of Defense

The government never squarely addressed Mr. Smith's good-faith defense—instead, they tried to twist it into something it never was. While Mr. Smith testified that he did not remember reading portions of emails or documents, the main point of this testimony was that he would not have understood them to mean that SDB was not a WOSB even if he had read them. The government never responded to his main point. Rather, the government distracted the jury by suggesting that his defense rested on Mr. Smith never being exposed to the WOSB definition. For example, during closing, the government said that "Mr. Smith knew how to read documents that were put in front of his face. But then the whole theory is that he skipped the bad parts." 8/3 (closing) Tr. 38-39.

The government also claimed that Mr. Smith attempted to shift blame for his misrepresentations concerning SDB's WOSB status to certain individuals to whom Mr. Smith

---

[15] Exhibits 5 and 6 were provided to defense counsel about one month prior to trial as part of a discovery production that included about five million pages of documents. Despite significant efforts to review as much of the new discovery as possible, Mr. Smith's counsel did not discover these emails in time for trial. Had these emails been discovered before trial, they could have been used to cross examine Mr. Eldredge about Mr. Smith's knowledge, expertise, and job performance. The emails also would have significantly undermined the government's claims about Mr. Smith's exemplary knowledge and management skills.

never attributed any fault. In closing, the government said the following about Mr. Smith allegedly blaming Patricia Overway: "And then we have Patricia Overway. Maybe it's her Fault. . . . [I]t's not Patricia Overway's job to stop this fraud. . . . Really? Patricia Overway's fault?" 8/6 (closing) Tr. 34-35. And the government claimed Mr. Smith was trying to do the same by introducing a document that assigned Sabrina Kidd to completing representations and certifications on the Jacobs bid: "Maybe she's the villain. Maybe she just signed things without Mr. Smith knowing about it." *Id*. at 34.

These arguments misstated Mr. Smith's actual testimony. They were not responsive to Mr. Smith's actual statements and significantly misled and confused jurors. The government created a false impression about Mr. Smith's statements, his understanding, and the reasons for why Mr. Smith asserts that he is innocent of the charges that have been brought against him.

The government's conduct undermined Mr. Smith's right to present a defense and to have his fair day in court. Based on the verdicts returned by the jury, it appears that the government successfully mislead and confused jurors about Mr. Smith's defense. Granting Mr. Smith's request for a new trial will provide him an opportunity to have his version of events and his defense to be fairly considered by jurors.

## III.  Denial of Mr. Smith's Request for Three-Month Continuance Significantly Impeded His Right to a Fair Trial

In seeking its last continuance of the trial date, the defense urged the Court that it would need at least an additional three months to prepare effectively for trial, largely due to the volume of discovery—approximately 5 million pages—and the government's delay in identifying the *Brady* materials in that discovery. 5/28 Hr'g Tr. 4, 7, 8, 16. Since trial, the defense has continued its efforts to sift through the discovery the government provided, and uncovered additional evidence showing that: (1) Mr. Smith consistently reported to Vencore and Jacobs that

SDB was not a WOSB, once he understood that SDB was not a WOSB; and (2) Mr. Myers and

Mr. Eldredge took a dim view of Mr. Smith's abilities and skills on the job, which would have

been valuable to impeach Mr. Eldredge's testimony and undermine the government's theory that

Mr. Smith was knowledgeable about government contracting.

### A. Mr. Smith's consistent statements to Vencore and Jacobs

#### 1. Communications Between Mr. Smith and Ms. Holmes (Jacobs) Just Before the October 12, 2015, Emails

At trial, the government repeatedly pointed to the October 12, 2015, email that Mr. Smith

exchanged with Ms. Holmes, and emphasized Mr. Smith's apparent one-month delay in

responding to Ms. Holmes's September 17, 2015, email, asking whether he had any additional

updates to Jacobs's internal KMS profile. *See* 7/26 (Holmes) Tr. 163; GX 148. As discussed

above, that email—if anything—was more evidence of Mr. Smith's innocence than his guilt.

But the government repeatedly cited this email as evidence that Mr. Smith hid from Ms. Holmes

that SDB's socioeconomic status had changed (even though he had accurately updated the

company's profile in SAM months before). *See* 8/3 (closing) Tr. (104-106).

After the trial, the defense located in discovery an email that Ms. Holmes sent Mr. Smith

on October 6, 2015, requesting an in-person meeting. In her email, which was two days before

she sent the email about updating SDB's information on KMS, Ms. Holmes wrote, "we'd like to

discuss some of the concerns that we have going forward into FY16." She proposed a meeting

for the morning of October 8 and Mr. Smith responded "Yes. We probably have the same

concerns. We also would like to discuss our plans to improve the process and get your

feedback." Mot. Ex. 7. During the afternoon on October 8, Ms. Holmes forwarded Mr. Smith

her email from September 17 and wrote, "*This* is the request that I sent to you last month

regarding the KMS information" (emphasis added). Viewed in context, it seems probable that

she and Mr. Smith talked about her request during that October 8 meeting—which Mr. Smith made no effort to avoid having with her—and that they discussed her request during that meeting.

This October 8 meeting is not referenced in any of Annette Holmes's interview memos. She did not mention it in her testimony. But it undermines the government's narrative that Kevin Smith was somehow dodging Annette Holmes's emails or avoiding communicating with her because he was trying to hide his fraud.

Evidence about an October 8 in-person meeting is information that the defense did not have sufficient opportunity to locate before trial and had it had this information before trial, would have used it to prepare its defense. The defense would have conducted further investigation concerning this meeting, including attempting to question Ms. Holmes about the meeting prior to trial. And the defense likely would have questioned Ms. Holmes about the meeting on cross-examination and sought to admit the email as a defense exhibit.

## 2. *Communications with Vencore*

Although the government called Annette Holmes to testify about the October 12, 2015 email, the government introduced no similar evidence to suggest that Mr. Smith did the same for Vencore after he had changed SDB's SAM certification. That's odd if you consider how much more valuable the ESC contract was to SDB than the Jacobs one was. *See* 8/2 (Smith) Tr. 110-11. Presumably, Mr. Smith would have been more motivated to hide the alleged fraud from Vencore as the more lucrative prime contractor.

But as the evidence made clear, Mr. Smith testified—and the evidence at trial showed—that SDB had submitted a bid to Vencore July 9, 2015, i.e., just a couple weeks after Mr. Smith had submitted the updated SAM certification. *SDB stated in that bid to Vencore that it was a small business, not a woman-owned small business.* DX 123; 8/2 (Smith) Tr. 186-87.

Tellingly, the government named on its witness list—but ultimately did not call—Cynthia Minter, a Vencore employee who, like Ms. Holmes at Jacobs, also wrote Mr. Smith in the fall of 2015 to inquire whether SDB was a woman-owned small business. *See* ECF No. 117 at 1; GX 147 (not admitted) (Mot. Ex. 8). Ms. Minter also was the Vencore employee who received the bid that SDB submitted in July 2015 and that Mr. Smith testified he worked on. DX 123; 8/2 (Smith) Tr. 186-87. Although Mr. Smith did not respond to Ms. Minter's September 15, 2015 email in writing, (1) it is clear that SDB had already notified Vencore, both through SAM and a subsequent contract bid, that it was not a WOSB; and (2) an email chain that the defense has located in the discovery post-trial indicates that, by some point in the Fall of 2015, Ms. Minter was aware that SDB was no longer a woman-owned small business. On November 11, 2015, in response to an email that she received from Mr. Eldredge, using his USA email account, Ms. Minter responded: "Has your company name changed? Who is BuildwithUSA? Are you still a small business." Mot. Ex. 9. Mr. Eldredge responded, " SDB and Universal Services Associates . . . *are under common ownership*, but are entirely separate business entities . . . . I've cc'd Mike Myers, *our President/CEO*, in case you have any other questions or would like further information. *Alle, Mike and I were all present at the meeting on Friday last with Oliver and Kevin Smith*." *Id.* (emphasis added).

Based on an interview memo and notes produced by the government, it does not appear that the government ever showed Ms. Minter a copy of that July 2015 bid or the email that she received from Mr. Eldredge in November 2015. And a critical portion of the handwritten notes from Ms. Minter's July 23 interview about SDB's change in classification appears difficult to read and written over. Mot. Ex. 10.

Ms. Minter has refused to speak with the defense and the defense was unable to locate her to serve a subpoena on her prior to trial.  The defense attempted to subpoena her testimony by sending a subpoena to Vencore, but it did not learn until the eve of trial that she no longer worked there.  If a new trial is granted, the defense intends to continue attempting to locate Ms. Minter for service.

### B.  Evidence that Mr. Eldredge and Mr. Myers Had a Dim View of Mr. Smith's Abilities and Skills

As discussed above, since trial, the defense has located additional evidence that Mr. Myers and Mr. Eldredge—contrary to Mr. Eldredge's testimony that he viewed Mr. Smith as a sophisticated businessman with knowledge about government contracting matters (7/27AM (Eldredge) Tr. 310)—expressed unfavorable opinions about Mr. Smith's abilities and skills.  Mr. Smith would have used this evidence to cross-examine Mr. Eldredge to undermine the government's argument that Mr. Smith was knowledgeable about government contracting.

## IV.     A New Trial is Warranted Due to Improper Jury Instructions

Both parties agreed that Mr. Smith's state of mind—what Mr. Smith knew and understood about the regulations governing women-owned small businesses—was the central issue at trial.  The crux of Mr. Smith's defense was that, even though he was wrong about what those regulations meant, his misunderstanding of those regulations was honestly held and in good faith.  For that reason, Mr. Smith requested an instruction in the good-faith defense that it applies "even if the good faith belief is objectively unreasonable."  ECF 120 at 94.

The Court denied that request.  8/3 Tr. 266.  That was improper.  Mr. Smith was entitled to such a defense *even if his honestly held opinion or honestly held belief at the time was objectively unreasonable.  See Cheek v. United States*, 498 U.S. 192, 202 (1991).  This omission prejudiced Mr. Smith because it would have made it more likely that jurors would question the

reasonableness of his belief—that the complete WOSB requirements only applied to third-party formal certification and not self-certification (which only required a woman to be the majority owner)—and therefore convicted him on a negligence standard based not on what he actually knew, but on what he should have known.

The government, in closing, repeatedly suggested to the jury that Mr. Smith's failure to connect the requirement that a woman owned be involved in the day-to-today operations with self-certification was objectively unreasonable given what he had read. *See, e.g.,* 8/3 (closing) Tr. at 16-31, 109-110.

But what Mr. Smith should have known, as he testified, is not the same as what he actually knew. He genuinely believed that the only requirement for self-certification was that a woman own the small business. But without the benefit of the omitted instruction language, the government was able to argue to the jury that Mr. Smith should be convicted based on what he *should* have known, because what he testified that he believed was not objectively reasonable. *See id*. at 32 (arguing that "the defendant's excuse that it's just all about share ownership is asking you to believe that one plus two equals one").[16] [17] Given the errors in how the jury was instructed, a new trial is warranted.

---

[16] This Court also improperly instructed the jury and impermissibly shifted the burden of proof in the instructions it provided about reasonable doubt (Instruction No. 3), proof in the alternative (Instruction No. 32), and proof being disjunctive (Instruction No. 33). The failure to define reasonable doubt in Instruction No. 3, and in conjunction with two other instructions (Instructions No. 32 and 33) that misled the jury about the burden of proof, lessened the government's burden of proof. *See United States v. Reives*, 15 F.3d 42, 44 (4th Cir. 1994) ("it is per se reversible error to give a reasonable doubt instruction that arguably decreases the government's burden of proof"). And Instructions No. 32 and 33—which were not pattern instructions—misstated the law and suggested to the jury that it could convict by a "unanimous finding of any of the elements" that constitute conspiracy or wire fraud, rather than all of the elements. Finally, the Court improperly declined to instruct the jury about "Unanimity/Disagreement Among Jurors" (D-15).

[17] The Court also improperly instructed the jury regarding venue, in declining to instructing the jury that venue must be reasonably foreseeable to a defendant. This omission allowed the government to argue in closing that "the use of wire communications has to be reasonably foreseeable . . ., but it doesn't have to

## V. A New Trial is Warranted Due to Improper Evidentiary Rulings

### A. Mr. Eldredge's Plea Agreement Statement of Facts

The government sought to introduce the entire Statement of Facts document that was part of Gifford Eldredge's plea agreement. 7/28 (Eldredge) Tr. 100. Defense counsel objected on hearsay grounds. Id. at 100-101. After the government argued that the Statement of Facts was a prior consistent statement under Fed. R. Evid. 801(d)(1)(B), the court allowed the government to introduce paragraphs 1 and 2 on pages 15 and 16 of Government's Exhibit 161. Id. at 101-104. Paragraphs 1 and 2 of Mr. Eldredge's Statement of Facts are not "prior consistent statements" under Rule 801(d)(1)(B), and should not have been admitted, for at least two reasons.

First, Rule 801(d)(1)(B) applies only when "[t]he declarant testifies and is subject to cross-examination *about* a prior statement." Fed. R. Crim. P. 801(d) (emphasis added).[18] The government told the Court that it was offering Mr. Eldredge's Statement of Facts "to rehabilitate that his story has not changed over time." 7/28 Tr. 102. But the defense had not cross-examined Mr. Eldredge about any prior inconsistent statements, and the government did not say it was seeking admission of the Statement of Facts to rebut any such cross-examination. Accordingly, paragraphs 1 and 2 from Mr. Eldredge's Statement of Facts were not admissible as prior consistent statements under Rule 801(d)(1)(B).

Second, any prior consistent statement admitted pursuant to Rule 801(d)(1)(B) must have been made prior to any motive to fabricate. In *Tome v. United States*, 513 U.S. 150, 157 (1995), the Supreme Court recognized that the rule is meant to prevent cumulative evidence and

---

be specifically reasonably foreseeable that the defendant knew that Virginia was the place where the wires would go through." Day 6 Tr. at 6.

[18] When counsel for the government explained Rule 801(d)(1)(B) at a bench conference, he said prior consistent statements may be admitted under the rule "'if the declarant testifies and is subject to cross-examination.'" Trial Tr. 101. The "about a prior statement" language was omitted from the government's explanation of the rule.

"reinforce the significance of the requirement that the consistent statements must have been made before the alleged influence, or motive to fabricate, arose." *Id.* at 158. The statements in Mr. Eldredge's Statement of Facts were not made before he would have had a motive to lie, i.e., before agreeing to cooperate in the investigation against SDB. The Statement of Facts was drafted in tandem with the government in connection with Mr. Eldredge's cooperation plea agreement.[19] *See* GX 161, 3-14; *see also United States v. Henry Gifford Eldredge*, 21-cr-30 (AJT), ECF No. 13. Mr. Eldredge certainly had an interest to curry favor with the government and a motive to fabricate at the time he adopted the Statement of Facts. Accordingly, statements from his Statement of Facts should not have been admitted pursuant to Rule 801(d)(1)(B).

### B. Government's Exhibit 52

Mr. Smith also objected to the admission of Patricia Overway's June 4, 2014, email as depicted in Government's Exhibit 52 because the attachments to that exhibit were not presented in the same order as they appeared when she sent the email to Mr. Smith. Government's Exhibit 52 arranges the highlighted attachment as the first attachment to this email while Defendant's Exhibit 102 has this attachment appearing after the draft capabilities statement. As discussed at trial, there is evidence supporting that Defendant's Exhibit 102 depicts the attachments in the correct order and Government's Exhibit 52 does not. Because Government's Exhibit 52 was not authentic, it should never have been admitted into evidence, and its admission significantly prejudiced Mr. Smith. *See* Fed. R. Evid. 901, 1002, and 1003.

## VI. COVID-19-Related Issues Denied Mr. Smith a Fair Trial

A new trial is warranted in Mr. Smith's case because his Fifth Amendment right to due process and his Sixth Amendment right to a fair trial were violated due to reasons related to the

---

[19] Defense counsel believes the government drafted the Statement of Facts and Mr. Eldredge simply agreed to sign and adopt the document.

COVID-19 pandemic.  Just before Mr. Smith's trial, a sharp increase in COVID-19 cases and deaths due to the Delta variant began to occur, which continued throughout the trial.  The need for implementation of a new general order requiring stricter safety protocols must have seriously alarmed jurors.  The new order—and the changed public health concerns at the time supporting the new order—must have caused tremendous concern and anxiety.  This concern and anxiety likely distracted jurors and made them want to rush through Mr. Smith's trial.  Under these conditions, there was a serious risk that some jurors were not paying adequate attention during closing arguments and rushed through deliberations.[20]

These conditions violated Mr. Smith's constitutional rights to due process and a fair trial. The ability to observe witnesses as they testify and view evidence the witnesses are testifying about is an essential part of a juror's fact-finding mission.  This mission was severely limited because of concerns about COVID-19.  And changing circumstances associated with the pandemic undoubtedly distracted jurors and caused them to rush through their deliberations. Accordingly, it is in the interests of justice that Mr. Smith be given a new trial.

## CONCLUSION

For all of the foregoing reasons, Mr. Smith respectfully requests that the Court grant him a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

Respectfully submitted,
_____/s/_____
Jonathan Jeffress (#42884)
Tony Miles (admitted *pro hac vice*)
Amelia J. Schmidt (admitted *pro hac vice*)
Jade Chong-Smith (admitted *pro hac vice*)
KaiserDillon PLLC
1099 Fourteenth St., N.W.; 8th Floor—West
Washington, D.C.  20005

---

[20] The jury returned their verdicts on the first day of their deliberations just before they were about to be excused for the day.

Telephone: (202) 683-6150
Facsimile: (202) 280-1034
Email: jjeffress@kaiserdillon.com
Email: tmiles@kaiserdillon.com
Email: aschmidt@kaiserdillon.com
Email: jchong-smith@kaiserdillon.com

*Counsel for Defendant Kevin N. Smith*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 19th day of October 2021, the foregoing was served

electronically on the counsel of record through the U.S. District Court for the Eastern District of

Virginia Electronic Document Filing System (ECF) and the document is available on the ECF

system.

*<u>/s/ Jonathan Jeffress</u>*
Jonathan Jeffress
