IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 1:20cr74 |
| v. | Hon. Anthony J. Trenga |
| KEVIN N. SMITH, Defendant. | Sentencing: February 9, 2022 |

## United States' Sentencing Position

The United States of America, in accord with 18 U.S.C. § 3553(a) and the U.S. Sentencing Commission Guidelines Manual ("Guidelines"), hereby provides its position with respect to sentencing for defendant Kevin N. Smith. The United States requests that this Court adopt the findings of the Pre-Sentence Investigation Report ("PSR"), which indicates that the appropriate Guidelines range is 46–57 months.

Based on that range and the § 3553(a) factors, a meaningful period of incarceration is necessary to capture the seriousness of Smith's conduct, including his repeated self-certification of a business as being controlled by a woman on a daily basis when he knew it was not. In addition, both specific and general deterrence counsel for a term of incarceration in a case, like this one, where a defendant chooses to take the stand and testify that he did not read or understand that what he was doing was a lie—despite overwhelming evidence that he very much did but simply never thought he would be caught. That said, the sentence here should also capture Smith's lack of criminal history and avoid unwarranted sentencing disparities with his co-conspirators who have already been sentenced (but all of whom, unlike Smith, accepted responsibility and cooperated with law enforcement). As such, downward variant sentence of at least 12 months of imprisonment and fine of $100,714.52 (Smith's gain from the crime) is a reasonable overall sentence here.

## I.    Factual Background[1]

Smith, a 62-year-old Florida resident, has a Master's in Business Administration and worked in government contracting for more than 30 years. From August 1983 to October 2013, Smith worked for a large government contractor, ultimately earning around $165,000 per year before being laid off. In March 2014, Smith was hired by Michael Myers to become the general manager of SDB Engineers & Constructors, Inc. ("SDB"), a Florida-based NASA government contractor that Myers's father founded in or about 1994 as a *de facto* subsidiary of Universal Services Associates, Inc. ("USA"), a Pennsylvania-based company.[2] When Myers's father started SDB, he listed Anne Robins, who then worked full-time in administrative support for USA, as SDB's 51% owner, with Myers's father owning the remaining 49%. Myers's father did so even though he controlled the company because he wanted to obtain government contracting preferences afforded to companies that qualified as woman-owned small businesses. This plan was fraudulent: in order to qualify as a woman-owned small business for government contracting purposes, majority ownership by a woman is not enough; a woman must also control the management and daily business operations of that business. Robins never did so. As a result, SDB unlawfully claimed woman-owned small business status from its inception until roughly June of 2015, obtaining several subcontracts with NASA prime contractors as a result of its fraud.

---

[1] The PSR, trial testimony, and motions practice before and after trial adequately set forth the offense conduct in this case, as do the Statements of Facts ("SoFs") signed by those co-conspirators who pled guilty in this case. *See United States v. Myers,* 1:21cr31 (E.D. Va. April 20, 2021) (Doc. No. 14); *United States v. Eldredge*, No. 1:21cr30 (E.D. Va. April 26, 2021) (Doc. No. 14); *United States v. Robins*, No. 1:21cr32 (E.D. Va. April 27, 2021) (Doc. No. 14).

[2] SDB is "Company A" in the Indictment and USA is "Company B." Because both companies, and the related prime contractors, have been extensively named in public filings and trial testimony, the government refers to the parties by their actual names here. The same is true of "M.C.M." (Michael C. Myers), "A.R." (Anne Robins), and "H.G.E." (Henry Gifford Eldredge).

When Smith was hired at SDB, he knew the value of claiming woman-owned small business status; indeed, he asked about whether SDB was a woman-owned small business during his job interview even though it was conducted by two men. After being told that SDB was still claiming woman-owned small business status until Robins sold her shares in the company, Smith agreed to start working for the company without meeting Robins. Thereafter, Smith became the highest-ranking SDB official handling its daily business operations in Florida, ultimately reporting to Myers in Pennsylvania. For the first several months at SDB, Smith sought to grow the company's business but never interacted with or met Robins despite claiming to others that SDB was a woman-owned small business.

In May 2014, Smith became unquestionably aware of the ongoing fraud at SDB after Myers sent him, Myers's brother, and Henry Gifford Eldredge—then the chief operating officer of USA—an American Bar Association article about the woman-owned small business program. As the Court is well aware from Smith's trial, Myers's cover email to Smith and the others laid out the two-part definition for a self-certified woman-owned small business, noting that SDB could only "remain self certified if [Myers's] wife was made 51% share holder" but that "she would have to leave her current job and work full time for the company." Gov. Trial Exh. 39. But because Myers did not view that as a viable option, he suggested instead that they continue to use Robins's paper ownership to claim woman-owned small business status even though SDB did not actually qualify for it. The article made clear that even though this is what Myers was suggesting they do, doing so would be fraudulent: the article expressly stated that to be a woman-owned small business for federal contracting, "[t]he management and daily business operations of the [business] concern must be controlled by one or more women. This means that both the long-term decision making and the day-to-day management and administration of the business operations must be conducted

by one or more women. . . . The woman who holds the highest officer position also must manage it on a full-time basis, must devote full-time to the business concern during normal working hours, and must not engage in outside employment that prevents her from devoting sufficient time and attention to the daily business." Gov. Trial Exh. 35A.

After reviewing the article, Smith responded that he "[a]gree[d] the self-certification is our best option at this point," Gov. Trial. Exh. 39, *i.e.*, that they could get away with claiming self-certified status based on Robins's paper ownership of SDB, even though she was not performing any work for SDB at all at that point (as she had retired the previous year). Eldredge responded, highlighting even more pointedly that it would be fraudulent for them to do so. He stated, among other things, that "SDB does not meet the standards for <u>daily business operations controlled by a woman</u>" and that he "can't imagine Anne agreeing to become involved in daily operations at this point." *Id.* (emphasis in original). He further warned, "I don't see any advantage to having [Robins] continue [as president of SDB on paper] for the next three years, since her involvement in the business isn't sufficient to earn the benefit." *Id.*

Nevertheless, Myers directed that SDB maintain the status quo, and Smith agreed with that direction by continuing to represent SDB as a woman-owned small business. Smith even did so after meeting face-to-face with Patricia Overway, a Florida small-business contracting specialist who personally explained the two-part definition of a woman-owned small business to Smith (and then followed up with a pre-highlighted explanation of that definition by email). Gov. Trial Exh. 52. Smith also did so despite seeing the two-part definition when certifying SDB in the System for Award Management in July 2014 and signing a one-page form that included that definition above his signature before submitting a fraudulent proposal to Jacobs Technology in August 2014. Gov. Trial Exhs. 65, 82. All the while, Smith had only a single interaction with Robins: a meeting in

Pennsylvania in July 2014 during which she exerted control over nothing and gave Smith no reason to believe she was anything other than the figurehead for his and Myers's scheme.

As a result of the fraud, Smith was able to fulfill his original purpose in being hired at SDB: after less than six months on the job, he secured a second NASA subcontract (with Jacobs) to supplement SDB's ongoing NASA subcontract with Vencore, thus growing the company's business even though no woman was involved in its management and daily business operations. As detailed in the attached declaration summarizing the financial benefits to SDB and Smith from the scheme, the impact of that Jacobs subcontract was significant: SDB went from deriving between 87 and 96% of its deposits from Vencore work in the second and third quarters of 2014 to a nearly equal percentage of its deposits from Jacobs and Vencore in 2015. *See* Exh. A at 4–5 n. 4.

After securing that financial advantage from the Jacobs subcontract, Smith and Myers ultimately ceased representing SDB as a woman-owned small business, but they did not do so honestly or quickly. For example, neither Smith nor Myers ever told Vencore or Jacobs the truth— that SDB never actually qualified as a woman-owned small business during the time that the two men led the company. Rather, Smith waited until he was prompted by the System for Award Management in June 2015 to update SDB's status to change it to a generic small business, and when questioned about the change by Jacobs, Smith falsely stated as late as October 2015 that Robins "has informed us she is retiring" and that Myers and his brother were "in the process of buying her shares." Gov. Trial Exh. 148. Smith knew that both statements were false, but he misled Jacobs for a very simple reason: telling them the truth that he had only met Robins once and that she was not involved in SDB at all would have alerted Jacobs to the fact that Smith secured the subcontract through fraud.

In total, from the time of the May 2014 email exchange through June 2015, Smith helped SDB fraudulently obtain approximately $803,684.44 in illegal profits from the Vencore and Jacobs subcontracts, and Smith personally benefited in the amount of approximately $100,714.52. *See* Exh. A at 4–5.[3] Smith received a raise to an annual salary of $110,000 in the midst of that growth, and ultimately, Smith parlayed his success in growing SDB to a job at a bigger government contractor where he earned between $130,000 and $140,000 annually.

After leaving SDB for his new job at a larger government contractor, Smith was interviewed by law enforcement twice about SDB. In the first interview, Smith admitted that Robins was not involved in SDB's daily business operations. But after being confronted in the second interview with his false certifications and the May 2014 email exchange, Smith falsely claimed that he was not actually sure what Robins's involvement was at SDB at the time of those certifications or that email exchange. Smith then repeated this self-contradictory performance during his trial testimony, when he admitted that Robins did not control the daily business operations of SDB but denied that she was a figurehead and claimed ignorance about whether she actually functioned as its president. In both his second interview and his trial testimony, Smith feigned ignorance about the two-part definition of a woman-owned small business, asserting that he did not read what he was sent or signed because he knew that admitting he read those materials meant he was guilty of fraud.

Ultimately, the jury unanimously rejected Smith's testimony and convicted him of Count 1's conspiracy to commit wire fraud charge, as well as the wire fraud counts alleged in Count 2

---

[3] The dollar amount for Smith's personal gain is $0.01 lower than the total in the PSR because the total initially provided to the Probation Office was a combination of two rounded totals added together, but the exact total then rounded is $0.01 lower.

(relating to the false System for Award Management certification accessed by Jacobs) and Counts 4–7 (relating to payments obtained from Vencore), but acquitting him of Count 3 (relating to a payment from Vencore for which the government did not admit a specific email showing Smith's direct involvement in or knowledge of that particular payment). After denying Smith's posttrial motions for a judgment of acquittal and a new trial, this Court set sentencing for February 9, 2022.

## II.    Guidelines Calculation

As the Court is well aware, although the Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 261 (2005). Thus, at sentencing a court "must first calculate the Guidelines range." *Nelson v. United States*, 555 U.S. 350, 351 (2009). Here, the United States asks the Court to adopt the PSR's advisory Guidelines range with respect to incarceration of 46–57 months. That includes a base offense level of 7, a 14-level enhancement based on gain as a proxy for loss of more than $550,000 but less than $1.5 million, and a 2-level enhancement for obstruction of justice as a result of Smith's false trial testimony.

Although the government agrees with the PSR's Guidelines calculations, Smith's counsel objected to essentially every aspect of those calculations in the first draft of the PSR, and the government briefly responds to those objections here in anticipation that Smith will maintain them at sentencing. In short: as explained below, the PSR's calculations are accurate and fairly reflect Smith's criminal conduct in this case, and those objections should thus be overruled.

That being said, the government respectfully suggests that the Court find on the record at sentencing that it would impose the same sentence irrespective of the particular advisory Guidelines range in this case because both parties are requesting a downward variance from the

PSR's advisory range, and it appears likely that the § 3553(a) factors will be the primary factors in the Court's ultimate sentence in this case in any event.

### A.    SDB's Gain as a Proxy for Loss

First, Smith objected to the draft PSR's application of a 14-level enhancement for conspiracy-wide gain as a proxy for loss exceeding $550,000 but falling below $1.5 million. This calculation is based on the $803,684.44 in gross profit that SDB earned on the Vencore and Jacobs subcontracts from May 14, 2014, to June 25, 2015. *See* Exh. A at 4. Smith's primary argument is that the loss in this case should actually be $0 because SDB performed the work at NASA that was required in its subcontracts with Vencore and Jacobs. *See* PSR at 26-27 (addendum including objection and Probation Office's response).

This argument is wrong. As a threshold matter, Application Note 3(B) to U.S.S.G. § 2B1.1 provides that the "court shall use the gain the resulted from the offense as an alternative measure of loss only if there is a loss but it cannot reasonably be determined." Here, that is precisely the case: there is a loss, or pecuniary harm as defined by Application Note 3(A)(iii), in that Vencore and Jacobs, two NASA prime contractors, paid money to SDB, a NASA subcontractor, that was counted as being spent on a qualified woman-owned small business. But that loss "cannot reasonably be determined" because the precise cost of remedying that harm—ensuring that a qualified woman-owned small business gets the subcontracting dollars, benefit of past performance on future bids, and the like—is contingent on factors such as the status of an actually qualified woman-owned small business, what contract it would bid on, and the like. That pecuniary harm cannot reasonably be determined, but as Application Note 3(B) makes clear, it would be incorrect simply to stop there; rather, the proper method is instead to calculate gain as a proxy for loss. Here, that gain is the total of gross profits earned by SDB as a result of the fraud: $803,684.44.

Importantly, this calculation also is the calculation that most comports with common sense. In the context of programs like the woman-owned small business program, the purpose of the program is not to micromanage which *individual, lower-level* workers perform the work on-site for a company like Vencore or Jacobs on behalf of NASA. Instead, the purpose of the program is to ensure that women or other historically disadvantaged groups *are in day-to-day control of companies*, precisely so that they can earn the long-term financial benefits that have otherwise accrued to those (like Myers and Smith in this case) who have benefited from their historical positions of relative privilege. The best way to calculate the *harm*, therefore, is to look to a calculation like gross profits, and the reason is because that is the money that most often goes to fund either the long-term value of the company or to benefit its general overhead—costs that include a general manager like Smith, the person whose certification was necessary here in order to perpetuate the fraud. In other words, the harm in cases like this one is the fact that *the wrong group of managers got the benefit of running a more profitable business*, and the best estimation of that harm is to calculate the gross profits to SDB during the pertinent timeframe.

It is worth noting, as the PSR does in overruling Smith's objection, that using gain via gross profits as a proxy from May 2014 to June 2015 errs on the side of being conservative. That is because some courts, including the Fourth Circuit, have previously calculated loss in such cases as the full dollar value of the contract. *See, e.g.*, *United States v. Brothers Const. Co. of Ohio*, 219 F.3d 300, 317–18 (4th Cir. 2000) (deciding, based on an earlier version of the Guidelines, that set-aside fraud loss is the full value of the contract). Other courts have agreed. *See United States v. Blanchet*, 518 F. App'x 932, 956–57 (11th Cir. 2013); *United States v. Leahy*, 464 F.3d 773, 789–90 (7th Cir. 2006) (finding that use of gain via profits as proxy for loss was "too low" and loss

should have been full face value of the contract, but finding error harmless because it favored the defendant).

The government is not arguing for the full face value of the contract as the loss number here, however, both because the government agreed not to seek such a calculation in the context of Smith's co-conspirators and because there is some disagreement among courts on the issue, particularly after amendments to the Guidelines that followed the *Brothers* decision. *Compare, e.g., United States v. Singh*, 195 F. Supp. 3d 25, 28–33 (D.D.C. 2016) (finding full face value of the contract to be the proper calculation of loss) (citing *Brothers*, *Blanchet*, and *Leahy*) *with United States v. Martin*, 796 F.3d 1101, 1111 (9th Cir. 2015) (rejecting full contract face value and noting for remand that "if it is not feasible to determine the actual or intended loss [in a case involving disadvantaged business programs], district courts may use the defendant's gain as another way to measure the loss"); *United States v. Nagle*, 803 F.3d 167, 182–83 (3d Cir. 2015); *United States v. Crummy*, 249 F. Supp. 3d 475, 486–88 (D.D.C. 2017) (rejecting *Singh* and finding that although gain via profits as proxy for loss is proper calculation, profits were zero on contracts at issue because they resulted in an actual loss to the company); *United States v. Wilson*, No. 4:17cr24, 2018 WL 3946561, at *2 (W.D. Mo. Aug. 3, 2018) (agreeing with *Crummy*'s analysis and finding that the "real monetary loser would be the unknown intended beneficiary of the set-aside legislation, which presumably might have made a profit comparable to the $609,000 received by the fraudulent-status bidder or even the total profit of $1.8 million received by it and the defendant's company as the collusive subcontractor").[4] As such, the government believes that gain

---

[4] *See also United States v. Wadhawan*, No. 1:17cr250, 2017 WL 4618454, at *1–3 (D. Md. Oct. 16, 2017) (surveying cases and finding gain via profit as proxy for loss to be proper calculation because that is best method to subtract the fair market value of services rendered from the face value of the contract).

via gross profits as a proxy for loss is the most reasonable calculation in this case because it is the number that best approximate what a deserving woman-owned small business should have gotten instead of SDB.

Smith also argues, in the alternative, that even if gain is used as a proxy for loss, the sole gain that the Court should consider here is his personal gain, or $100,714.52. *See* Exh. A at 5.[5] That, too, is wrong. As the PSR notes, U.S.S.G. § 1B1.3(a)(1)(B) provides that specific offense characteristics are determined based on the conspiracy's gain, not based on the individual's gain. As such, it is improper to use only a defendant's personal gain as a proxy for loss in a conspiracy case like this, and the Court should reject this alternative argument.

### B. *Smith's Role in the Offense*

Next, Smith contends that the PSR should have applied a four-level reduction pursuant to U.S.S.G. § 3B1.2(a) for being a "minimal" participant in this crime. According to Application Note 4 to § 3B1.2, that reduction only applies to those "who are plainly among the least culpable

---

[5] The attached declaration includes this calculation from May 2014 through June 2015, as well as various other calculations for the Court's knowledge. Those include the total gross profits starting from Smith's hiring at SDB in March 2014, from the time of his August 2014 false certification to Jacobs, and also calculations that include Vencore payments only starting with the payment referenced in Count 4 (but not the payments before that, including that referenced in Count 3, of which Smith was acquitted). The government agrees with the PSR's use of the time period from May 14, 2014, to June 25, 2015, for the illegal gain to SDB and Smith as the most reasonable estimate of gain as a proxy for loss in this case. The government also notes that it is proper to consider the payment related to Count 3 both because it is relevant conduct for purposes of Count 1's conspiracy conviction and the various convictions related to the scheme to defraud, and also because the Court may consider acquitted conduct as relevant conduct if proved by a preponderance of the evidence at sentencing. *See United States v. Watts*, 519 U.S. 148, 157 (1997) (court may sentence based on conduct underlying acquitted counts, so long as that conduct has been proved by a preponderance of the evidence); *United States v. Jinwright*, 683 F.3d 471, 484 (4th Cir. 2012) (same, citing *Watts*) *United States v. Lawing*, 703 F.3d 229, 241 (4th Cir. 2012) (same, citing *Watts*). Smith has not raised any argument to the contrary, and sensibly so.

of those involved in the conduct of a group." Smith argues that this applies to him because, he contends, the fraud at SDB began long before he was hired as the company's general manager.

That argument is misguided, however. It would be one thing, of course, were Smith held responsible for the gain for the full scope of the SDB fraud dating back to its inception. But as noted previously, Smith has neither been convicted of such a conspiracy nor been held accountable for the full gain that resulted from the SDB fraud. Instead, Smith's convictions and the advisory Guidelines range only hold Smith accountable for the time period following his decision to continue the ongoing fraud. And in that regard, Smith is plainly the second-most culpable participant in the crime of which he was convicted: indeed, the only person more culpable during the time period in question (May 2014 to June 2015) was his boss, Michael Myers. Anne Robins had been retired for more than a year and was not even involved in any meaningful way at that point, and Gifford Eldredge was only involved insofar as he was USA's chief operating officer participating in SDB's business affairs because it was a subsidiary company. But unlike Smith, Eldredge did not earn a salary from SDB, and unlike Smith, Eldredge was neither the person actually certifying SDB as a woman-owned small business nor the person seeking to use his success at SDB to obtain more lucrative employment. In short, while Smith may have been a lesser participant than Larry Myers in the lengthy SDB conspiracy and even Michael Myers in the narrower conspiracy, he is not a minimal participant in the crime for which he was actually convicted. In the context of that crime, Smith was an average participant, and the PSR's application of neither an enhancement nor a reduction for role is correct.

### C.    Smith's Obstruction and Lack of Acceptance

Finally, Smith objects both to the PSR's application of a two-level enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, for his perjurious trial testimony, and to the

PSR's non-application of a two-level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a).

Once again, the PSR is correct, and Smith's objection should be overruled. First, as to obstruction, the enhancement has been properly applied because the defendant took the stand, denied having understood the two-part definition of a woman-owned small business, and the jury rejected that denial. In this regard, Application Note 4(B) and (F) to § 3C1.1 provide that the "types of conduct to which this adjustment applies" include "committing, suborning, or attempting to suborn perjury" and "providing materially false information to a judge." Application Note 2, in turn, further provides that "[a] defendant's denial of guilt (*other than denial of guilt under oath that constitutes perjury*) . . . is not a basis for application" of the obstruction enhancement. (Emphasis added). In addition, in the Fourth Circuit "[t]here are three elements necessary to impose a two-level enhancement for obstruction of justice based on the defendant's perjurious testimony: the sentencing court must find that the defendant (1) gave false testimony; (2) concerning a material matter; (3) with willful intent to deceive." *United States v. Perez*, 661 F.3d 189, 192 (4th Cir. 2011). The court should make specific findings as to each element. *Id.* at 193.

Here, Smith's testimony meets each element. He testified repeatedly, and falsely, that he did not believe self-certification as a woman-owned small business required a woman to control the company. *See, e.g.*, Day 5 Trial Testimony at 91:2–4; 119:22–24. He testified, falsely, that nothing he discussed with Patricia Overway affected that belief or touched on that definition. *See, e.g.*, *id.* at 123:22–124:4, 226:4–7, 228:13–16. He testified, falsely and implausibly, that his belief was that all that was required was paper ownership. *See id.* at 216:20–23. He also testified, falsely and implausibly, that he thought that "[t]he entire time I worked there, [Anne Robins] was retiring"—a period of 2 years and 7 months. *Id.* at 205:6–12.

When confronted with the logical consequences of his apparent defense, Smith responded as follows:

Q:      Sir, you certainly would agree that SDB did not have its management and daily business operations controlled by one or more women?

A:      Yes, I do agree to that.  And like I said, I know that's a requirement now, but that's not what I knew then and I apologize.

Q:      And so, sir, your testimony, just so I get it straight, is that the only thing you thought was required to be a woman-owned small business to self-certify was that a woman owns 51 percent of the shares?

A:      Yes.

Q:      So your belief at that time was that anybody could simply put their wife, their sister, their aunt, their niece in charge of the company on paper and that was enough?

A:      In practicality, yes, but that would also be fraudulent.

Q:      Sir, you have a master's in business administration, right?

A:      I do.

Q:      You've heard of things called shell companies, right?

A:      Yes.

Q:      You knew that figureheads were not appropriate in the woman-owned small business program, didn't you?

A:      Yes.

Q:      But you knew that's what Anne Robins was?

A:      No, I did not know.  All I know is she was the president and key stakeholder at that time.

Q:      Well, sir, you said a couple of times on direct examination that she was listed as the president, right?

A:      Yes.

Q:      But she didn't actually function as the president, did she?

14

A:      I wouldn't know.

Q:      Sir, you were the general manager?

A:      Yes, of SDB.

Q:      You managed the day-to-day operations on the ground?

A:      Yes, I did.

Q:      So, sir, when you saw this definition, you knew that no woman controlled
         the daily business operations of SDB?

A:      I don't recall.

*Id.* at 216:9–217:22. In context, this "I don't recall" was plainly false, as was the claim that Smith

"wouldn't know" whether Robins actually functioned as SDB's president.

   As to materiality, all of the defendant's false testimony went to the heart of the key issue

at trial—the defendant's mental state. It was therefore material. *See United States v. Sun*, 278 F.3d

302, 314 (4th Cir. 2002) (affirming obstruction enhancement and stating that the materiality of the

defendant's testimony was "obvious" because it "concerned the heart of the case, *i.e.*, whether he

acted with the requisite criminal intent").

   Turning to the willful intent to deceive element of the obstruction enhancement, the Court

must find that the defendant's false testimony did not result from confusion, mistake, or faulty

memory. § 3C1.1 cmt. n. 2; *United States v. Jones*, 308 F.3d 425, 428 n. 2 (4th Cir. 2002). The

defendant testified, unambiguously and emphatically, in response to questions from his

attorney. And as the Supreme Court has stated, "[a] defendant's right to testify does not include a

right to commit perjury." *United States v. Dunnigan*, 507 U.S. 87, 96 (1993). For that reason, the

Supreme Court explained that § 3C1.1's sentencing enhancement

> furthers legitimate sentencing goals relating to the principal crime,
> including the goals of retribution and incapacitation. It is rational for

a sentencing authority to conclude that a defendant who commits a crime and then perjures herself in an unlawful attempt to avoid responsibility is more threatening to society and less deserving of leniency than a defendant who does not so defy the trial process. The perjuring defendant's willingness to frustrate judicial proceedings to avoid criminal liability suggests that the need for incapacitation and retribution is heightened as compared with the defendant charged with the same crime who allows judicial proceedings to progress without resorting to perjury.

*Id.* at 97–98 (internal citations omitted). *See also United States v. Stewart,* 686 F.3d 156, 176 (2d Cir. 2012) (rejecting defendant's argument that her trial testimony denying knowledge of or participation in the conspiracy could not serve as basis for obstruction enhancement because they were merely expressions of opinion); *United States v. Garcia*, 994 F.2d 1499, 1509 (10th Cir. 1993) (affirming obstruction enhancement where defendant denied his involvement in the conspiracy and holding that denial was a material matter which the defendant was not likely to have been confused, mistaken, or forgetful).

Simply put, Mr. Smith gave false testimony under oath about the central issue in this case in a willful effort to deceive the jury and win an acquittal. As such, a two-level enhancement is appropriate pursuant to § 3C1.1.

For the same basic reasons, application of a two-level reduction for acceptance of responsibility pursuant to § 3E1.1(a) would be unwarranted. As Application Note 2 to § 3E1.1(a) states, the "adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and express remorse." And while the same Application Note states that "[i]n rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercise his constitutional right to a trial," this is not such a case. As Application Note 2 explains, such a "rare situation[]" might occur where the issue that causes a

16

defendant to go to trial "do not relate to factual guilt." By contrast, this trial was entirely about Smith's factual guilt, which he denied—again, repeatedly—from the witness stand. As such, this Court should overrule Smith's objection to the PSR's non-application of § 3E1.1(a).[6]

## III.     Section 3553(a) Factors

As the Court is also well aware, after calculating the Guidelines, a sentencing court must then consider that Guidelines range, as well as the sentencing factors set forth in § 3553(a), and determine a sentence that is appropriate and reasonable for the individual defendant.  *Nelson*, 555 U.S. at 351; *see also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). With respect to § 3553(a)'s enumerated factors, of particular pertinence here are the "nature and circumstances of the offense" and the need for the sentence "to reflect the seriousness of the offense," "the history and characteristics of the defendant," the need for the sentence "to afford adequate deterrence to criminal conduct," and "the need to avoid unwarranted sentencing disparities." § 3553(a)(1), (a)(2)(A), (a)(2)(B), (a)(6). As explained below, based on those factors, a downward variance of at least 12 months if incarceration is reasonable in this case.

### A.     Smith's conduct was serious and warrants a meaningful period of incarceration.

The fraud in this case, as the Court has previously recognized, was serious. Smith helped steal more than $800,000 in profits for his company, and more than $100,000 personally, that should have gone to the management of an *actual* woman-owned small business. As a result, Smith victimized the woman-owned small business program three times over: he defrauded the taxpayers

---

[6] This is also not the "extraordinary case[]" in which both an enhancement under § 3C1.1 and a reduction under § 3E1.1(a) are simultaneously applicable. § 3E1.1 cmt. n. 4. *See, e.g.*, *United States v. Barley*, 343 F. App'x 944, 946 (4th Cir. 2009) (defendant bears burden of showing that circumstances are extraordinary to merit reduction) (citing *United States v. Hudson*, 272 F.3d 260, 263–64 (4th Cir. 2001)).

who fund the program; he obstructed NASA (which administers the program through its award of contracts); and he stole business from SDB's competitors—actual woman-owned companies. And Smith did so by exploiting his privilege in one of the most pernicious ways possible: by claiming that he was part of a historically *disadvantaged* group in a way that he was not. Indeed, the entire purpose of the woman-owned small business program is to level the playing field for women like Anne Robins in a world of men like Kevin Smith and Michael Myers.

B.      *Smith's personal history and characteristics, including his sophistication and experience in government contracting, warrant a sentence of at least 12 months.*

Smith's personal history and characteristics, and particularly his level of sophistication, also counsel in favor or a term of incarceration of at least 12 months. Smith was the general manager of SDB and its highest-ranking official in Florida. Like Myers, he came into a fraud that was ongoing before he arrived, and like Myers, he chose to perpetuate rather than stop it. But pertinent to his personal history and characteristics, he did so despite marketing himself as a person who was more than capable of blowing the whistle on such a scheme. That he chose not to do so shows that his involvement in this crime was not the product of mistake or a one-time lapse in judgment. Rather, it was a calculated risk in which he believed that he could get away with the lie and take out the ongoing fraud machine for one last spin, then parlay his success at SDB into a bigger, better-paying job. In short: a defendant who claims that he has a "[u]nique ability to overhaul contracts in disarray after just one examination," Gov. Trial Exh. 170, cannot come into a company like SDB and claim that continuing the fraud is anything other than a deliberate, calculated choice. For that reason, although this defendant has no criminal history, a sentence of at least 12 months is necessary in this case.

C.      *General deterrence also warrants a sentence of at least 12 months.*

The nature of the small business contracting system also means that general deterrence is especially important in cases like this one, which are not victimless. Attached as Exhibit B is an interview report of the former female owner of a woman-owned small business that served as a woman-owned small business subcontractor to Jacobs Technology before SDB obtained such business. That owner explained that frauds like SDB's "hurt legitimate companies in financial and human terms." Exh. B at 2. As that owner recalled, over time her company lost its NASA subcontracting business at Kennedy Space Center, where SDB worked as a fraudulent woman-owned small business, and her company thereafter "lost money and people lost their jobs." *Id.*

Moreover, as the victim-impact letter attached to the PSR from Glenn Delgado, the NASA Associate Administrator for Small Business Programs, makes clear, "[w]hen a business obtains contract funds through fraudulent misrepresentations or other serious misconduct, as SDB did here, it frustrates the purpose of these federal programs and siphons money away from eligible deserving [woman-owned small businesses]." PSR at 33. Indeed, "[t]he damages to NASA go beyond the cost of the contract funds paid to SDB. The objectives and success of NASA's participation in the Woman-Owned Small Business Federal Contracting Program cannot be accomplished without a high level of confidence in the [woman-owned small businesses] that benefit from this program." *Id.* at 34. As a result, when general managers do what Smith did, "the NASA 'brand' is tarnished because the award process has been negatively impacted." *Id.*

It is true, of course, that SDB ultimately performed the work that it was contracted to perform. And it is true that the government cannot show with certainty which—if any—other legitimate woman-owned small business might have obtained more work had Smith not chosen to further the fraud others started. But it is equally certain that Smith's company was not entitled to

those profits. As the legitimate woman-owned small business owner referenced above put it, "This mess needs to be laid at the feet of the greedy men" who perpetrated it. Exh. B at 2. The general manager of that mess at the end was this defendant, and at least 12 months of incarceration is necessary here to deter others from perpetrating similar frauds.

> D.   *Specific deterrence warrants a period of incarceration where, as here, a defendant falsely testifies at trial, does not accept responsibility, and shows no contrition.*

A sentence of at least 12 months is also necessary here for specific deterrence because this defendant chose to take the stand and falsely testify under oath in an effort to gain acquittal. This followed his false backtracking and shifting stories given to NASA law enforcement when he was interviewed, and it stands in stark contrast to his co-conspirators, each of whom showed genuine contrition and acceptance of responsibility. While it appears unlikely that Smith will work in federal government contracting again, that is no guarantee, as he indicated to the Probation Office that "he wants to pursue employment as a consultant, but is awaiting the outcome of sentencing." PSR ¶ 98. And whether it is when he seeks out new employment, or merely whether it is when he chooses whether to pay his taxes honestly or dishonestly, this defendant, like all white-collar defendants, will have both a position of privilege but also one of power: he will have to decide, given the choices and consequences he made before, whether to make the same or a different choice the next time. If he receives no term of incarceration, it is much more likely he makes the same choice—to lie for money—again. The most telling fact in that regard is his trial testimony, where instead of accepting even the simple fact that he read what he signed, he obfuscated in hopes of facing no consequences at all. The jury did not believe him, and neither should the Court. In such a situation, a sentence of at least 12 months is warranted.

E. *A sentence of at least 12 months here avoids unwarranted sentencing disparities.*

Finally, a sentence of at least 12 months would also avoid unwarranted sentencing disparities. As the Court is aware, Michael Myers received a sentence of six months of incarceration for his role in this conspiracy, and at the time that he was sentenced, Myers faced a low end of his advisory Guidelines range of 24 months—30 months before a 20% U.S.S.G. § 5K1.1 motion by the government. In that regard, the sentence that the Court imposed was roughly one-quarter of the low end of the advisory Guidelines range for Myers.

A sentence of at least 12 months would be roughly commensurate with that here, given Smith's advisory Guidelines range of 46–57 months. Such a similar downward variance for Smith as to Myers would recognize both the similarities and differences between their conduct. For example, it is clear that had neither Myers nor Smith accepted responsibility or cooperated, and had both gone to trial and testified falsely, Myers would have warranted a greater sentence than Smith. But their choices since being confronted by law enforcement have resulted in those two defendants switching places in terms of relative culpability. In other words, while Myers's crime was more serious, Smith's contrition is nonexistent. And while Myers truthfully cooperated, Smith testified falsely under oath. As a result, a sentence of at least 12 months for Smith would avoid unwarranted sentencing disparities in the broader context of this case.

Smith also deserves a greater sentence than either Eldredge or Robins. Eldredge was the least involved of the four individuals who have pled guilty in this case; he neither took a salary nor derived real financial benefit from SDB, and his primary participation was in attempting to explain that they could not commit the crime but then going along with what Myers and Smith did anyway. And that is even before the substantial assistance provided by Eldredge and his genuine contrition shown at sentencing. Similarly, although the temporal duration of Robins's involvement exceeded

Smith's, Robins was in many ways the person whose disadvantaged status was most tangibly exploited by men like Myers and Smith, and again, Robins both cooperated truthfully and showed genuine remorse.

If Smith were to receive a sentence closer to that of Eldredge and Robins, and particularly if Smith were to receive a sentence that does not include a meaningful term of incarceration, it would send a very dangerous message to those in the future in positions like Gifford Eldredge and Anne Robins, and indeed, it would send a very disturbing message to Eldredge and Robins in particular: you could have lied under oath, refused to accept any responsibility, and shown no genuine contrition, and the result would have been the same.

In short, Eldredge and Robins are defendants who should receive probationary sentences in a case like this; Smith, like Myers, is not.

## IV.    Conclusion

For the reasons stated, a sentence of at least 12 months and fine of $100,714.52 provides a reasonable overall sentence for this defendant.[7]

---

[7] Although the NASA victim-impact letter attached to the PSR references restitution, the government is seeking only a fine of Smith's personal gain: here, $100,714.52. This is commensurate with the financial penalties paid by his co-conspirators: Myers agreed to pay forfeiture of $893,062.77; Robins paid forfeiture of $183,262.34; and the Court ordered Eldredge to pay a $5,000 fine. The government requests a fine rather than seeking forfeiture here given the contested nature of this sentencing and to avoid unnecessary litigation regarding forfeiture.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:      _____/s/_____
Ryan S. Faulconer
Counsel for the United States
2100 Jamieson Avenue
Alexandria, Virginia 22314
Office:   (703) 299-3700
Fax:      (703) 299-3980
Email:    ryan.faulconer@usdoj.gov

**Certificate of Service**

I certify that on February 2, 2022, I electronically filed a copy of the foregoing with the

Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF)

to all counsel of record.


By:   _____/s/_____
        Ryan S. Faulconer
        Special Assistant United States Attorney